178 N.J. Super. 7 (1981)
427 A.2d 1114
MINA L. SMITH, INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
CYPRUS INDUSTRIAL MINERALS COMPANY, A DIVISION OF CYPRUS MINES CORPORATION, THOMAS KWASIZUR, JOHN N. BLAZAKIS, LULA BLAZAKIS, STAMATIS GOLFINOPOULOS AND KASSIANI GOLFINOPOULOS, JOINTLY AND SEVERALLY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 1, 1980.
Decided January 27, 1981.
*10 Before Judges SEIDMAN, ANTELL and LANE.
Howard William Kushner argued the cause for appellant.
Harry R. Hill, Jr. argued the cause for respondent Cyprus Industrial Minerals Company (Backes & Backes, attorneys; Harry R. Hill of counsel; Michael J. Nizolek on the brief).
John Montis argued the cause for respondents John N. Blazakis, Lula Blazakis, Stamatis Golfinopoulos and Kassiani Golfinopoulos.
The opinion of the court was delivered by SEIDMAN, P.J.A.D.
Plaintiff Mina L. Smith, Inc., a realtor, brought suit against the seller and purchasers of a commercial property in Ewing Township, claiming to be entitled to commissions as the procuring cause for the sale. Three counts of the complaint pertained solely to the seller, Cyprus Industrial Minerals Company (Cyprus) and its vice-president, Thomas Kwasizur. They set forth causes of action for, respectively, alleged breach of contract, misrepresentation and malicious interference with plaintiff's prospective economic advantage. The fourth count, abandoned at trial, charged the purchasers, John N. Blazakis and Stamatis Golfinopoulos, with breach of an agreement to pay a finder's fee. The last count, which also included the spouses of these defendants, alleged that they had "knowingly, willingly and maliciously interfered with the contractual relationship of plaintiff and Cyprus Mines Corporation," causing plaintiff to lose "its earned fee for the sale." The trial judge, at the close of plaintiff's proofs, granted motions made on behalf of all defendants for judgment of involuntary dismissal. This appeal followed.
*11 We are entirely satisfied that the trial judge correctly dismissed the complaint insofar as it related to the seller. Clearly, with respect to the first count, any agreement that may have been reached between the seller and plaintiff authorizing the latter to sell the real estate in question and providing for a commission did not comply with the statute of frauds, N.J.S.A. 25:1-9, and thus was unenforceable. It is uncontroverted that the broker's authority, if any, was not in writing signed by the owner or its authorized agent, nor was it recognized in a signed writing or memorandum either before or after the sale was effected. Furthermore, plaintiff's letter to the owner advising that it had shown the property to several persons, including defendant Blazakis, and expected to be paid a commission upon consummation of a sale, lease or option, was an ineffectual attempt to comply with the notice provision contained in the second paragraph of N.J.S.A. 25:1-9. The letter was not sent within five days after the making of the alleged oral agreement with the owner, nor did it set forth the terms of the agreement and the rate or amount of the commission to be paid, as required by the statute. See Fontana v. Polish National Alliance, 130 N.J.L. 503 (E. & A. 1943).
The record is devoid of any evidence to support plaintiff's theory of misrepresentation on the part of the seller, which is the subject matter of the second count. Plaintiff's reliance on the case of Louis Schlesinger Co. v. Wilson, 22 N.J. 576 (1956), is misplaced. The facts are inapposite. There, the alleged deceit by the seller was his failure to inform the broker at the time of the oral agreement that he had already given someone an option to purchase the property, thereby causing the broker to persist in its efforts to find a purchaser upon the representation that the owner stood ready to consummate a sale. Id. at 585. While plaintiff seeks to bolster its theory by a selective quotation from the opinion in the cited case, it ignores, however, the following significant passage:
... here the alleged deceit did not permeate the contractual relationship between the parties, and in this sense it did not inhere in the transaction ... *12 [citations omitted]. The misrepresentation complained of did not go to the existence or non-existence of the requirement of a writing. The plaintiff broker knew better than anyone else that this was necessary to entitle it to a commission.... [Id. at 585]
Though clothed in the garb of alleged misrepresentation, the second count is a palpable attempt to circumvent the statute of frauds. In essence it charges that the seller made an oral agreement or representation to pay a commission but then failed to do so. Plaintiff may not accomplish indirectly that which it cannot do directly. Cf. McCann v. Biss, 65 N.J. 301 (1974).
Plaintiff does not complain on appeal of the dismissal of the third count. Its counsel acknowledged at trial that McCann v. Biss, supra, precluded the action against the seller for alleged tortious interference with plaintiff's prospective economic advantage.
We turn to the fifth count, which sought damages from the purchasers for alleged interference with a contractual relationship between plaintiff and the seller. Since we perceive no basis for disturbing the dismissal with respect to the purchasers' wives, we limit our discussion to the involvement of Blazakis and Golfinopoulos. The trial judge terminated the proceedings at the close of plaintiff's proofs by granting defendants' motions for involuntary dismissal. On such motion, the established test to be applied by a trial judge is
... whether "the evidence, together with the legitimate inferences therefrom, could sustain a judgment in ... favor" of the party opposing the motion, i.e., if, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. Bozza v. Vornado, Inc., 42 N.J. 355 (1964); Bell v. Eastern Beef Co., 42 N.J. 126 (1964); Franklin Discount Co. v. Ford, 27 N.J. 473, 490 (1958). [Dolson v. Anastasia, 55 N.J. 2, 5 (1969)]
Viewed most favorably to plaintiff, there was evidence in this case from which a jury could have found these facts:
Plaintiff's representatives, having learned that the Cyprus property was available, met with Thomas Kwasizur, Cyprus' vice-president, viewed the property, conferred with Kwasizur and were informed by him that the property was for sale on an *13 open listing basis "at a price of a million dollars and a commission of 50 or 60 thousand dollars would be paid if the building were sold for a million dollars. In no event, not more than six percent ... Not more than six percent of the million dollars." Plaintiff's president, Joseph Hayes, and other sales personnel went to work in an attempt to sell the property. They communicated with various research and development companies to ascertain if they were interested. One of the salesmen, Claude Chew, also telephoned a number of prospects, including Blazakis. He showed Blazakis the property on several occasions and introduced him to Kwasizur. According to Chew, Blazakis expressed an interest in the property early in March, but said he needed time "to put together a tenant," and suggested an option arrangement. On March 10, 1974 plaintiff sent Kwasizur the letter referred to above, advising of its expectancy "to be named Realtors of record and therefore be paid a commission" if a "sale, lease or option be consummated" with any of the persons, including Blazakis, to whom the property had been shown.
When Blazakis inquired of Kwasizur to whom an offer should be addressed, he was instructed to submit it directly. Although Blazakis stated that Kwasizur told him no broker was involved, Kwasizur's version of the conversation was that Blazakis was told the property was being sold on an open basis and no one had an exclusive listing. Chew advised Blazakis that his listing was an "all broker's protected situation," and that a commission would be paid by the sellers. Blazakis wrote to Kwasizur on March 11, 1974, on behalf of himself and his partner, defendant Golfinopoulos, that they were interested, and offered a deposit of $30,000. Blazakis and Kwasizur continued to negotiate directly with each other, although Blazakis "assumed" that plaintiff was "trying to promote a sale" when the property was shown. Kwasizur informed Blazakis and Golfinopoulos several times that plaintiff wanted a commission, but he told them that he was uncertain whether plaintiff was entitled to it. In April 1974 Cyprus and Blazakis and Golfinopoulos entered into a contract for the sale of the property for $850,000 "net of *14 commissions." A clause was inserted whereby the purchasers agreed to save harmless and indemnify the seller for any real estate broker's commission.
Throughout the month of March Hayes and Kwasizur had "continuous conversations" in a "concerted effort to put together a deal." They lunched together twice. On the first occasion, at which an option was discussed, Hayes expressed his dissatisfaction with the commission of $50,000-$60,000. Although there was no discussion of a commission on anything but a sale of $1,000,000, Kwasizur told Hayes, "You get a successful buyer and we will take care of you." At the second luncheon meeting, in April, Kwasizur told Hayes that Blazakis and Golfinopoulos were "close to submitting an offer" of $850,000 and that it would be difficult to pay a commission. When asked at trial whether it was "Cyprus' intention to pay a commission if they received a price which was agreeable to them, terms agreeable to them," Kwasizur's response was, "I would have to say yes."
The contract for the sale of the property was signed April 16, 1974. Plaintiff's salesman, Chew, as well as Hayes, attempted unsuccessfully to obtain a copy of the contract from the purchasers' attorney in order to ascertain the terms and closing date and whether a provision for the payment of a commission was included. Kwasizur referred them to Blazakis who, in turn, told them to take up the matter with the purchasers' attorney. Plaintiff was not informed by anyone of the closing date, although, according to Chew and Hayes, Kwasizur assured them "we would be notified and paid at the settlement." The transaction was consummated the latter part of August.
It is not in substantial dispute that the seller here orally authorized plaintiff, though not exclusively, to act as its broker in the sale of the property at a specified price, the commission, in the event of a consummated sale, to be as stipulated. There is also agreement that plaintiff procured defendants Blazakis and Golfinopoulos as prospective purchasers and introduced them to Kwasizur, with whom they then proceeded to negotiate *15 and consummate a purchase of the property. There can be no doubt that Blazakis was fully aware of plaintiff's interest in the matter as a real estate broker.
The motions for involuntary dismissal of the fifth count were granted on the sole ground that "[t]he contractual relationship allegedly interfered with, if there was one, was an offer to sell this property at a million one with a commission of $60,000; there is absolutely no proof that there was any interference with that particular arrangement." We are convinced that the trial judge's approach was too restrictive and failed to give due consideration to the realities of the real estate brokerage business.
The principles applicable to a claim by a realtor for tortious interference with his brokerage business are well stated in Myers v. Arcadio, Inc., 73 N.J. Super. 493 (App.Div. 1962):
His knowledge of available properties is the broker's chief stock in trade. Development of interest in those properties by exhibiting them to potential buyers is his chief activity, and he does that frequently with nothing more than the expectation that if he produces a buyer the owner will pay him a commission. That expectation may arise from an express agreement with the seller (even though unenforceable, because oral or for other reasons), but it may also arise out of other circumstances, such as an offer to the public or to brokers generally; and generally owners fulfill such expectations. It is actionable to rob the broker of the product of his stock and his industry when, but for the wrong of the buyer, it is reasonably probable that the owner would have paid the broker for it. [at 499-500]
Unquestionably, one who unjustifiably interferes with the contract of another is guilty of a wrong. Harris v. Perl, 41 N.J. 455, 461 (1964). That the contract may be unenforceable is no defense, for
"it usually is held that contracts which are voidable by reason of the statute of frauds, formal defects, lack of consideration, lack of mutuality, or even uncertainty of terms, or harsh and unconscionable provisions, or conditions precedent to the existence of the obligations, can still afford a basis for a tort action when the defendant interferes with their performance." Prosser, Torts (4 ed. 1971), § 129 at 932.
Despite the trial judge's view that there had been no interference with the agreement between the broker and the seller because it provided only for the payment of a commission upon a *16 sale in the amount of $1,000,000, the fact is that the complaint in this case actually did not confine the issue to interference with a specific contract; rather, it asserted an alleged interference with a contractual relationship. The initial authorization extended to the broker by the seller, though couched in fixed terms, was nevertheless subject to possible future modification by mutual agreement. It is common knowledge that often, even though a seller may initially limit the broker's authority with respect to the selling price and other terms of sale, further negotiations between the seller and purchaser, usually with the broker acting as the intermediary, will ultimately produce an agreement on terms acceptable to both sides.
The role of the broker is to bring buyer and seller together at terms agreeable to both, and both know the broker expects to earn a commission from the seller if he succeeds ... In a practical world the broker must trust that those who seek or willingly accept his services will not cheat him of the fruit of his industry. The courts should protect him from that abuse, except insofar as the countervailing policy of the statute of frauds may insulate the owner from liability. [Harris v. Perl, supra at 462-463]
In short, what is being protected is not simply the broker's listing agreement, if any, with the seller. It is also the broker's opportunity to persuade the seller to pay him a commission on the ultimate purchase price, notwithstanding the fact that the amount may be less than that specified in the agreement. Whether the tort is termed interference with a "contractual relationship" or with a "prospective contractual relationship" is immaterial. Cf. Geo. H. Beckmann, Inc. v. Charles H. Reid & Sons, Inc., 44 N.J. Super. 159, 166-167 (App.Div. 1957); and see Fitt v. Schneidewind Realty Corp., 81 N.J. Super. 497, 503 (Law Div. 1963). To hold as did the trial judge here would be an open invitation to prospective purchasers in such cases to bypass the broker and, through direct negotiations with the seller, agree upon a lower "net commission" purchase price. We have no hesitancy in concluding that a prospective purchaser who accepts the services of a broker and, after being brought to the seller by the broker, negotiates directly with the seller and buys the property, may not justify that action and avoid liability *17 to the broker for tortious interference with the contractual relationship between the broker and seller simply because the terms he was able to negotiate are not those contained in the brokerage agreement. Cf. Harris v. Perl, supra at 464.
We do not intimate from the foregoing that a jury would necessarily have found in favor of plaintiff in this case. The point we make is that such result could have been reached on the facts here present, thus precluding an involuntary dismissal. It was for the jury to determine from the evidence whether defendants wrongfully interfered with the conduct of negotiations which might have culminated in a commission and, if so, whether but for defendants' wrongful acts it is reasonably probable that plaintiff would have effected the sale of the property and recovered a commission. Myers v. Arcadio, Inc., supra, 73 N.J. Super. at 500. A wrongful act has been defined as "one which in the ordinary course of events will infringe upon the rights of others to his damage, or one which is done with the purpose of benefiting the acting party at the other's expense and is not done in the exercise of an equal or superior right." Fitt v. Schneidewind Realty Corp., supra at 504.
It is to be noted that the trial judge deemed significant the absence in the fifth count of any allegation of malicious interference with plaintiff's prospective economic advantage, a cause of action which had been asserted unsuccessfully against the seller in the third count of the complaint. Apparently, however, at least one of the defense counsel "had sort of been assuming since yesterday or the day before that I was dealing with [such claim]." The trial judge rejected plaintiff's argument that the proofs supported the theory of malicious interference with either a contractual relationship or a prospective economic advantage. It is true that plaintiff did not move to amend the complaint to conform to the proofs, but we do not consider the omission to be fatal where an alternate cause of action for tortious interference with a prospective economic advantage can be found in the proofs, assuming that the court *18 could properly have found, as a matter of law that there was no tortious interference with a contractual relationship between the broker and the seller. In any event, while the existence of a contractual relationship between the seller and broker is not a requisite to an action for interference, DiCristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 253 (App.Div. 1957), it does not follow therefrom that facts which would support a charge of interference with a contractual relationship, particularly where it is prospective, could not at the same time also spell out a cause of action for tortious interference with a prospective economic advantage. Basically, in either case the wrongful act must be found to have interfered with some expectancy on the part of the broker that the seller will pay him a commission. The expectancy exists whether it is founded on a listing agreement with the seller or whether the broker, even without such agreement, nevertheless produces an interested purchaser either on his own initiative or by direct inquiry from the purchaser regarding available properties. The line of demarcation is not so sharp that failure to prove interference with a particular contract should necessarily rule out a cause of action for tortious interference with a prospective economic advantage. We are satisfied that a jury issue existed here with respect to such tortious interference. Cf. Mayflower Industries v. Thor, 15 N.J. Super. 337 (Ch. Div. 1951), aff'd o.b. 9 N.J. 605 (1952). Since we discern no resulting surprise or prejudice to defendants, we think the pleadings should have been amended, sua sponte if necessary, to conform to the proofs. See R. 4:9-2; cf. 68th St. Apts., Inc. v. Lauricella, 142 N.J. Super. 546, 561, n. 3 (Law Div. 1976), aff'd o.b. 150 N.J. Super. 47 (1977).
We have carefully considered the remaining arguments advanced by plaintiff and find them without merit.
The judgment of involuntary dismissal of the fifth count of the complaint is reversed and the matter is remanded for a new trial limited to that count. In all other respects, the judgment is affirmed. Jurisdiction is not retained.