259 N.J. Super. 438 (1992)
614 A.2d 167
R.A. INTILE REALTY CO., INC., PLAINTIFF,
v.
MICHAEL F.P. RAHO, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division Essex County.
Decided July 2, 1992.
*443 C. Robert Sarcone argued the cause for plaintiff (C. Robert Sarcone on the letter brief).
Jerald D. Baranoff argued the cause for defendants, Michael and Deborah Raho (Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, Esqs.; Jerald D. Baranoff, of counsel; and Richard S. Schkolnick, on the brief).
SCHWARTZ, J.S.C.
On August 21, 1989 plaintiff, R.A. Intile Realty Co., Inc. a licensed real estate broker, filed a three count complaint *444 against defendants, Michael F.P. Raho and Debra Raho (jointly referred to either as "the Raho defendants," or "Raho"). Also joined as defendants were John Kimble ("Kimble") and O. Realty Corp., which is either a fictitious name or a company solely owned and controlled by Kimble, but those defendants have never been served. It appears from the certification of plaintiff's counsel that Kimble cannot be located and that O. Realty Corp. is neither a New Jersey corporation nor a foreign corporation licensed to do business in New Jersey and, accordingly, if not a fictitious name, that entity has not been located for service of process.
The first count of the complaint charges the Raho defendants with breach of a real estate brokerage agreement arising out of the sale of a four acre tract of land on which a home is situated located on Glen Avenue in Llewellyn Park, West Orange, New Jersey (hereinafter the "Glen Avenue home"). Title to the Glen Avenue home was transferred by deed dated May 13, 1988, from Raho to O. Realty Corp. Plaintiff alleges that on or about November 26, 1987 it and Raho entered into an oral agreement pursuant to which plaintiff was authorized to find a buyer for the Glen Avenue home at $1,200,000 and that if successful, plaintiff was to be paid a six percent commission. Plaintiff alleges in the first count that the oral agreement was confirmed by letter dated November 27, 1987. Plaintiff further alleges that it complied with N.J.S.A. 25:1-9 by mailing that letter on November 27, 1987 by ordinary mail to Raho. Plaintiff further contends that it procured Kimble as a purchaser; that Raho sold the property to Kimble's company, O. Realty Corp., for $957,000; that plaintiff thereby became entitled to receive a commission of $57,420; and that Raho breached the contract with plaintiff by refusing to pay said commission.
The second count alleges that all the defendants named in the complaint entered into a conspiracy to fraudulently conceal the sale of the Glen Avenue home from plaintiff, thereby fraudulently depriving it of said commission. Plaintiff seeks compensatory and punitive damages on the second account.
*445 In the third count, plaintiff seeks compensatory and punitive damages for alleged tortious interference with plaintiff's contractual rights and with plaintiff's prospective business advantage by all the defendants.
The Raho defendants now move for summary judgment, alleging that plaintiff's claim for a brokerage commission is barred by the statute of frauds, N.J.S.A. 25:1-9. Plaintiff has filed a cross motion seeking leave to amend the complaint by alleging in paragraph 3 of the first count that the written notice (the letter of November 27, 1987) was personally served, as well as served by ordinary mail, upon Raho.
The summary judgment motion requires resolution of the following legal issues:
(1) What proofs will suffice to establish a fact question under N.J.S.A. 25:1-9 as to whether the broker's written notice was "personally" served on the seller within five days?
(2) Will a broker's written notice which makes no express reference to an oral agreement between broker and seller, is signed by the broker and requests the sellers' signatures be sufficient under the statute of frauds to impliedly inform the seller of an oral agreement to pay commissions on which the broker relies solely because the notice refers to a "negotiated commission rate"?
(3) Does a broker who has failed to send a proper written notice of an oral brokerage agreement to the seller within five days have a right to maintain a contract action for commissions where the parties subsequently orally reconfirm or modify the earlier agreement and the broker sends a written notice to the sellers within five days of such oral reconfirmation or modification incorporating by reference the alleged prior commission agreement?
(4) Must the broker's written notice make reference to the seller's asking price or the duration of the oral agreement to satisfy the statute of frauds?
*446 (5) Where the broker complies with the statute of frauds, is the broker's claim limited to one for breach of contract or may the broker also seek damages against the seller for common law fraud or tortious interference with the broker's contractual rights and prospective business advantage?
Although numerous factual disputes are raised by the certifications of the parties, certain background facts appear undisputed. These may be summarized as follows.
The Rahos, both in 1987 and at present, reside on Edgehill Court in Llewellyn Park, West Orange, New Jersey (the "Edgehill home"). On April 1, 1987 Raho contracted to purchase a six acre tract of real estate on Glen Avenue, in Llewellyn Park (the "Glen Avenue property") from Alvin Mancusi-Ungaro ("Mancusi-Ungaro"). Prior to the purchase of the Glen Avenue property, Mancusi-Ungaro informed Raho that Kimble had been interested in purchasing that six acre tract and the selling broker had shown them several written offers made by Kimble to Mancusi-Ungaro.
Before Raho closed title on the Glen Avenue property on October 1, 1987, the property was subdivided into two parcels, one of which was an unimproved two acre parcel and the other was a four acre parcel on which was situated a large home, heretofore referred to as the Glen Avenue home, and out of which this litigation arises.
Following the subdivision and closing on the Glen Avenue property, Raho listed the Edgehill home and the two acre unimproved parcel located on Glen Avenue for sale with plaintiff. Raho executed two written multiple listing contracts, agreeing to pay plaintiff a five percent commission upon the sale of each property. The multiple listing contracts stated a selling price for each property and contained a provision for sharing of commissions with any cooperating broker who may have effected a sale. Both agreements were to remain in effect during specified dates between July 1987 and January 1988, and provided that the commission stipulated in the agreement *447 was to be paid if the property was sold to a person to whom the property was shown by plaintiff within three (3) months after the listing contract expired.
The Raho defendants have certified that they intended to move into the Glen Avenue home after they sold the Edgehill home, but upon advice of plaintiff's realtor associate, Linda Grabowski ("Grabowski"), continued to reside in the Edgehill home because it was more marketable if it was shown while it was being lived in and furnished. According to Grabowski, Raho informed her sometime prior to November 1987 that they would be interested in selling the Glen Avenue home if it could be done directly and without advertising it for sale. Grabowski makes no mention in her certification of when or where this alleged conversation with Raho took place or whether at that time a selling price or brokerage agreement with plaintiff concerning the Glen Avenue home was discussed.
Grabowski asserts that on November 24, 1987 she received a phone call from one Shirley Naso who expressed an interest in inspecting a house in Llewellyn Park which plaintiff had advertised in the preceding Sunday Star Ledger (the "Horvat house"); that she met Ms. Naso with her boyfriend Kimble at the Horvat house on November 25, 1987; that Grabowski knew Kimble because she previously worked for him; and that Kimble was not interested in the Horvat house. They then discussed the Glen Avenue home and Kimble, stating he did not know Raho, requested that Grabowski set up an appointment for him to meet with Raho.
Grabowski claims she had a telephone conversation with both Rahos on November 25, 1987 during the course of which she informed them that she had a prospective purchaser for the Glen Avenue home; that they were both extremely interested and that they were asking $1,200,000, but would not list the Glen Avenue home as an exclusive or multiple listing because of alleged concerns by Raho over the possible adverse reaction of other residents of Llewellyn Park if it became known that *448 the Rahos had purchased the Glen Avenue home for investment or speculation. Grabowski further asserts that Raho agreed during this conversation to pay plaintiff a commission if a sale was consummated and that they would permit Kimble, the prospective purchaser, to inspect the Glen Avenue home the next day. Grabowski further asserts that on November 26, 1987 she again called defendants to confirm a 2:00 p.m. appointment with Kimble the next day at the Glen Avenue home. Grabowski certifies that during that conversation, the defendants agreed to pay plaintiff a six percent commission if a sale was consummated with Kimble.
The Raho defendants deny having had any conversations in or prior to November 1987 concerning the sale of the Glen Avenue home. In their certifications both assert that during that time period they had no desire to sell the Glen Avenue home because they intended to move into it as soon as their Edgehill home was sold. Mrs. Raho asserts that she received one short phone call from Grabowski sometime during the Thanksgiving 1987 weekend; that Grabowski told her Kimble wanted to tour the Glen Avenue home; and that she asked her husband to walk through the home with Kimble. Mrs. Raho denies she ever discussed selling the Glen Avenue home with Grabowski, using plaintiff as a broker or listing the property with plaintiff. She further denies discussing a rate of commission or the time period of any brokerage agreement with Grabowski.
Janet Intile ("Intile"), who in 1987 was also a real estate associate with plaintiff, arranged to meet Kimble at the Glen Avenue home on November 27, 1987 because Kimble was over an hour late for the 2:00 p.m. appointment on November 27th and Grabowski had a 3:00 p.m. appointment with someone else. Intile asserts that she met Kimble, Kimble's mother and Shirley Naso at the Glen Avenue home sometime after 3:15 p.m. that day and that they were shown through the house by Mr. Raho. Intile claims that Kimble made an offer of $900,000 during this *449 visit, but that Mr. Raho told Kimble his asking price was $1,200,000.
Mr. Raho admits that during their November 27 meeting at the Glen Avenue home, Kimble offered $900,000 to purchase the house, but Mr. Raho asserts that he repeatedly told Kimble that he was not interested in selling the house and that he and his wife were looking forward to moving into the Glen Avenue home as soon as they sold their Edgehill home. (This assertion by Mr. Raho raises the obvious question as to why he was showing the house at that time if he had no desire to sell and was expecting to move in himself.) Mr. Raho further denies ever having had any discussions with Intile regarding the use of plaintiff as a broker for the Glen Avenue home or any listing agreement or rate of commission for the sale of that property.
Grabowski certifies that on November 27, 1987, some time prior to 2:00 p.m., she prepared the letter of that date which confirmed the telephone conversations she had with Raho on November 26, 1987. Grabowski asserts that one copy of the November 27, 1987 letter was mailed. Intile states she personally placed that letter in a mail box located on Northfield Avenue between Westview Road and Rock Spring Avenue in West Orange at about 5:00 p.m. on November 27, 1987. Grabowski certifies that she took another copy of that letter with her with the intent of delivering it to Raho after the meeting that afternoon with Kimble. Because Kimble was late and Grabowski had another appointment at 3:00 p.m., Grabowski left Llewellyn Park and telephoned Intile to request she meet Kimble at the Glen Avenue home. Grabowski asserts that she returned to Llewellyn Park later that day. When she arrived, she learned that Kimble and Intile had departed moments earlier and, because she was aware that Raho had social guests for the weekend and she didn't wish to disturb them, Grabowski left a copy of the November 27, 1987 letter with a security guard at the gatehouse with instructions to advise Raho that there was a letter for them at the gatehouse.
*450 Grabowski certifies that she had several telephone calls with Mrs. Raho between November 28 and 30, 1987 concerning the progress of negotiations with Kimble. Grabowski asserts that during one of these telephone conversations Mrs. Raho acknowledged receipt of the November 27, 1987 letter and that they discussed the six percent commission that plaintiff was to receive if the sale to Kimble was consummated. Grabowski further claims that she advised Mrs. Raho to show the November 27 letter to their attorney, Dennis Dowd. Grabowski states that she spoke with Ms. Naso and with Mrs. Raho on December 5, 1987. During the course of those conversations, Grabowski asserts that Mrs. Raho requested the opportunity to open direct negotiations with Kimble in an effort to get him to increase his offer and that Mrs. Raho requested Kimble's telephone number, but that Grabowski did not provide the number at that time.
Mrs. Raho denies Grabowski's version of the conversations of November 28 and 30, 1987 and December 5, 1987. Mrs. Raho claims that during her conversations with Grabowski between late November 1987 and December 20, 1987, she never discussed an interest in selling the Glen Avenue home, let alone using plaintiff as broker, and that she never discussed any rate of commission, length of agreement or selling price.
Mr. Raho denies having had any conversation with Grabowski or Intile between November 27 and December 20, 1987 and further denies ever having received the letter of November 27, 1987 through the mail or having seen it prior to December 20, 1987.
Mrs. Raho states that the first time she saw the November 27, 1987 letter was on December 20, 1987 when it was found, along with an undated handwritten note from Grabowski, in a basket of Christmas candy which had been left by Grabowski with one of the security guards at the Llewellyn Park gatehouse. Mrs. Raho denies that she was ever personally served *451 with the November 27, 1992 letter and that she ever received that letter in the mail.
The handwritten note from Grabowski which was enclosed in the Christmas candy package reads as follows:
Debbie & Michael,
These letters are just the formality we follow with an open listing.
They should be presented to Dennis if anything should materialize with John Kimble
Please call me if you need any additional assistance.
And have a wonderful Christmas & New Year's.
Linda
Mrs. Raho asserts that she became incensed when she read the November 27, 1987 letter and immediately called Grabowski and left a message on her answering machine. Mrs. Raho states that when Grabowski returned her call on December 21, 1987, she told Grabowski she had no plans to sell the Glen Avenue home and that they had neither discussed nor negotiated any listing or commission agreement with plaintiff nor agreed to a six (6) percent commission. During the phone call of December 21, 1987, Mrs. Raho claims she expressed anger and shock at receiving what she regarded as a back dated letter (the November 27 letter) from Grabowski. Mrs. Raho claims the letter of December 21, 1987 sent by Grabowski which she admits she received a few days later contains an inaccurate description of their conversation of December 21, 1987.
Grabowski's version of the December 21, 1987 telephone conversation completely contradicts that of Mrs. Raho. Grabowski describes a cordial conversation in which she discussed with Mrs. Raho the status of the negotiations with Kimble and again confirmed that a six percent commission would be paid to plaintiff if the sale was consummated. She claims that she then gave Mrs. Raho the telephone number for Kimble and made an appointment with Raho for 7:00 p.m. that evening. Grabowski asserts that this appointment was cancelled later in the day by Mrs. Raho because Mrs. Raho claimed she was having a dinner party at her home that evening. Grabowski *452 further claims that on December 23, 1987 she left at the Llewellyn Park gatehouse the letter of December 21, 1987 along with her handwritten note in a Christmas candy platter gift for Raho.
The listing agreement between the Raho defendants and plaintiff on the Edgehill home expired on January 6, 1988 and was not renewed. On February 18, 1988 the Raho defendants listed both the Edgehill home and the Glen Avenue home with Degnan & Boyle. Mrs. Raho states that the reason for listing both homes was that the Edgehill home remained unsold and Raho could no longer afford to carry the mortgage and property taxes for both homes.
Of significance is the fact that the listing with Degnan & Boyle on the Glen Avenue home excluded Kimble. Mrs. Raho asserts that their reason for excluding Kimble from the listing agreement with Degnan & Boyle was their awareness of Kimble's interest in the Glen Avenue home from their conversations with Mancusi-Ungaro and the selling broker.
The Glen Avenue home was sold to O. Realty Corp. on May 13, 1988. Mrs. Raho concedes that the Raho defendants understood at that time that O. Realty Corp. was owned and controlled by Kimble.
The legal issues raised by Raho defendants' motion for summary judgment must be resolved in the light of this disputed factual background.
N.J.S.A. 25:1-9, upon which defendants rely, provides in pertinent part as follows:
Any broker or real estate agent selling or exchanging real estate pursuant to an oral agreement with the owner of such real estate, who shall actually effect such sale or exchange before such oral agreement shall have been repudiated or terminated by the owner in writing as hereinafter provided, may recover from such owner the amount of commission on such sale or exchange, if the broker or agent shall, within five days after the making of the oral agreement and prior to the actual sale or exchange of such real estate, serve upon the owner a notice in writing, setting forth the terms of the oral agreement and stating the rate or amount of commission to be paid thereunder, and if the owner shall not *453 have repudiated or terminated the oral agreement prior to the actual sale or exchange of the real estate.
The owner may, at any time after receiving from the broker or agent the notice mentioned in ... this section, repudiate or terminate the oral agreement by serving upon the broker or agent, prior to the actual sale or exchange of the real estate by the broker or agent, a notice in writing to that effect, in which case the oral agreement shall be null and void, and no recovery of any commission shall be had under the oral agreement, unless the broker or agent in good faith shall have entered into negotiations with a prospective customer, and such negotiations shall be pending at the time of the repudiation or termination of the oral agreement, and the sale or exchange is subsequently consummated between the owner and such customer, in which case the broker or agent may recover his commission on such sale or exchange, notwithstanding the repudiation or termination of the oral agreement.
The notice provided for in this section shall be served either personally or by forwarding the same to the person to be served, by registered mail, to his last known post-office address.
Defendants assert two grounds for summary judgment under the above statute: (1) that the alleged written notice (the November 27, 1987 letter) was not served upon them personally or by registered mail within five days of the making of the alleged oral agreement, and (2) that the written notice did not comply with the statute because it did not purport to confirm the terms of the alleged oral agreement.
The standards governing the granting of motions for summary judgment pursuant to R. 4:46 require that the party moving for summary judgment exclude all reasonable doubt as to the existence of any genuine issue of material fact. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 110 A.2d 24 (1954); Shanley & Fisher, P.C. v. Sisselman, 215 N.J. Super. 200, 521 A.2d 872 (App.Div. 1987). The papers supporting the motion are to be closely scrutinized and the opposing papers indulgently treated. However, summary judgment is appropriate against a party who fails to furnish any evidence on an issue on which that party would bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
*454 N.J.S.A. 25:1-9, commonly referred to as the real estate broker's statute of frauds, "... represents a strong statement of public policy by the Legislature which cannot be ignored." McCann v. Biss, 65 N.J. 301, 309, 322 A.2d 161 (1974). Strict compliance with the requirements of the statute is required for the broker to recover a commission on the sale of real property. Fontana v. Polish National Alliance, & c., 130 N.J.L. 503, 505, 33 A.2d 844 (E. & A. 1943); McCann v. Biss, supra, 65 N.J. at 309, 322 A.2d 161.
The broker may satisfy the statutory requirements for service of the written notice required under N.J.S.A. 25:1-9 either by personal service of the written notice upon the seller or by service by registered mail to the seller's last known post-office address. It is well recognized "[t]hat statutory requirements for giving notice in a particular fashion must be strictly followed." Hammond v. Paterson, 145 N.J. Super. 452, 455, 368 A.2d 373 (App.Div. 1976). Thus, where as here, the statute requires registered mail as one approved method of service, ordinary mail will not suffice. Ibid. No presumption of receipt will arise from mailing by ordinary mail where the statute prescribes registered mail since the Legislature, by prescribing registered, rather than ordinary mail as the mode of service has expressed an intent to require, not evidence of presumptive receipt upon mailing, but positive proof of service which arises when the postal carrier obtains a signed receipt from the seller for the item delivered. Hammond v. Paterson, supra, at 455-456, 368 A.2d 373.
It is clear that plaintiff in this case did not send the November 27, 1987 letter by registered mail, and the mailing of that letter by ordinary mail did not satisfy the requirements of N.J.S.A. 25:1-9. The issue is whether there still exists a question of fact as to whether plaintiff satisfied the statutory requirements for personal service. Defendants' counsel has relied upon Levitt v. Colonial Boat Works, Inc., 70 N.J. Super. 555, 176 A.2d 48 (Law Div. 1961) for guidance in interpreting the *455 meaning of the term "personal service." Levitt involved the effectiveness of service of process by registered mail upon a partnership. The court there distinguished between "personal service" and "constructive service," holding that "... personal service is accomplished by delivering, that is, handing over to the defendant a copy of the writ, and the other is known as substituted or constructive service, notably achieved by registered mail." Id. at 557, 176 A.2d 48. Levitt is of limited precedential value here since the court there was governed by the well-recognized principle that any failure to comply strictly with the rules respecting service of process deprives the court of jurisdiction. Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 492-93, 86 A.2d 201 (1952).
Plaintiff's counsel has relied upon Alexander v. Rekoon, 104 N.J.L. 1, 139 A. 796 (Sup.Ct. 1927) which interpreted the term "personal service" as used in N.J.S.A. 25:1-9. Alexander appears to be directly on point. In that case plaintiff, a real estate broker, mailed by ordinary mail a letter confirming the terms of an oral brokerage agreement and testified at trial that defendant, during the course of a telephone call six days after the making of the oral agreement, admitted receipt of the letter. Defendant denied receipt of the letter or making any such admission. In affirming a judgment for the broker, the court defined "personal service" as follows:
Where a statute provides for personal service of notice, without requiring it to be made by an official or in a particular mode, the depositing of the notice with an agency of the federal government for the purpose of having it delivered, and the actual delivery thereof by such agency to the person to whom the notice is addressed, constitutes a personal service.
104 N.J.L. at 3, 139 A. 796.
The court in Alexander held that it was for the jury to resolve the credibility of plaintiff's testimony concerning whether defendant admitted receipt of the letter during the telephone conversation and that the jury could reasonably infer that a letter mailed by plaintiff in Newark the day after the oral agreement was made which was properly addressed to defendant's residence address also located in Newark was received *456 by defendant within the five day period prescribed by the statute.
Defendants question the continued efficacy of the rule enunciated in Alexander v. Rekoon, supra, based upon the fact that it was decided in 1927. They cite Ellsworth Dobbs, Inc., v. Johnson, 50 N.J. 528, 553, 236 A.2d 843 (1967) as having "changed the view of the law between brokers and their customers" and as having recognized the inequality of knowledge and bargaining power among the parties which gives brokers "undue advantage" and requires brokers to "show perfect good faith and openness of dealing." However, the Ellsworth Dobbs, Inc. case provides no support for defendants' argument since that case was not concerned with interpretation of the statute of frauds or with what proofs will suffice to establish personal service of the broker's written notice under that statute. In the fifty-five years since Alexander v. Rekoon, supra, was decided, the ruling in that case has never been questioned, let alone over-ruled. Although the result in Alexander v. Rekoon, supra, appears to be correct, its rationale may be questioned. Where the statute requires either personal service or service by registered mail, the Legislature could not have intended that the broker may satisfy the statute by sending his written notice via ordinary mail, thereby having a jury determine whether delivery was in fact made upon the seller by the United States Postal Service. By permitting the broker to serve the written notice "personally" upon the seller, the statute plainly requires that the broker or an employee or other agent of the broker must "personally" deliver the written notice by hand directly to the seller. The statute thus provides for two alternative methods of positive proof that the seller in fact received the written notice within the five day statutory period: (1) testimony by the broker or the broker's agent or employee that service was made "personally" on the seller or (2) a signed receipt obtained from the seller by the postal carrier when registered mail is used.
*457 However, in the Alexander case, the broker testified to a conversation with the seller six days after the oral agreement in which the seller allegedly admitted receipt through ordinary mail of the broker's written notice. Since the notice was mailed in Newark to the seller's address also located in Newark, this was sufficient to raise a fact question as to whether the seller received the notice within five days. Accordingly, the result in Alexander can be rationalized with the modern view that receipt of a statutorily mandated written notice within the time period provided by the statute, even though not served in the precise manner prescribed by the statute, will be deemed, in accordance with "the law of common sense," to comply with the statute. I.S. Smick Lumber v. Hubschmidt, 177 N.J. Super. 131, 425 A.2d 709 (Law Div. 1980), aff'd o.b. 182 N.J. Super. 306, 440 A.2d 1160 (App.Div. 1982).
In, I.S. Smick Lumber the court, in interpreting N.J.S.A. 2A:44-71, which requires mechanic's notices of intention to be served either personally or by registered or certified mail, held that ordinary mail of a notice of intention which was admittedly received by defendant, satisfied the statutory requirement for valid service. The court reasoned as follows:
To ignore the fact that a person has been given actual and concrete notice of an event merely because such notice did not conform to technical procedures not only flies in the face of common sense, it is precisely the type of labyrinthine misconception which brings the legal system into disrepute among laymen. This court rejects such reasoning. A bell cannot be unrung, knowledge cannot be erased, and actual notice is  or ought to be  the best notice unless either the English language or the law of common sense be repealed.
177 N.J. Super. at 136, 425 A.2d 709.
Similarly, in this case Intile has certified that the letter of November 27, 1987 was mailed by ordinary mail at 5:00 p.m. that day in West Orange to defendants' residence also located in West Orange. Grabowski has certified that the alleged oral brokerage agreement was finalized during a telephone conversation on November 26, 1987; that she prepared the letter the next day; that she hand delivered a copy of the letter that day to a security guard at the Llewellyn Park gatehouse with oral *458 instructions to inform Raho that there was a letter for them at the gatehouse; and, significantly, that during several telephone calls between November 28 and 30, 1987, Mrs. Raho acknowledged receipt of the November 27th letter. While these facts are disputed by defendants, there is certainly a question of fact as to whether personal service of the November 27th letter was made upon the defendants within five days of the alleged oral brokerage agreement, and accordingly defendants' motion for summary judgment based upon failure to serve the November 27th letter as required by N.J.S.A. 25:1-9 must be denied.
Defendants also challenge the legal sufficiency of the notice contained in the November 27th letter to satisfy the statutory requirements of N.J.S.A. 25:1-9. The November 27, 1987 letter typed on plaintiff's letterhead reads as follows:
Michael F.P. & Deborah Raho
Edgehill Court
West Orange, NJ
Re: Raho
Glen Avenue
Selling Commission Rate
As seller, you have the right to individually reach an agreement on any fee, commission, or other valuable consideration with any broker. No fee, commission or other consideration has been fixed by any governmental authority or by any Trade Association or Multiple Listing Service.
This is a negotiated commission rate of six (6) per cent of the negotiated selling price of the above referenced property. If agreement is reached between Michael F.P. and Deborah Raho and John Kimble a commission is due R.A. Intile Realty Inc. at agreed selling price at time of closing.
 _________________________________
 Michael F.P. Raho
 _________________________________
 Deborah Raho
The leading case concerning the statutory requirements for the content of a written confirmation of an oral brokerage commission is Fontana v. Polish National Alliance, & c., supra. After reviewing the legislative history of N.J.S.A. 25:1-9, the Court construed the Legislature's intent as follows:

*459 It is manifest that the 1918 amendment was intended to better the position of the broker, but it is equally clear that an agreement with the owner was still a prerequisite; an agreement which might be oral but which, if oral, should be followed by a writing from the broker to the owner setting forth the terms of the oral agreement with the right in the owner thus notified to repudiate or terminate the agreement. For the broker to give notice that he has solicited a prospective purchaser and will be entitled to a named percentage on the sale price if that person should purchase, but not to state that the potential claim for compensation is based upon an oral agreement, is to omit the vital fact upon which the statutory proviso is conditioned; yet respondent argues, as under the exigencies of his case he is obliged to argue, that such a notice complies with the statute.
Clearly, the owner, in proper circumstance, is permitted either to repudiate or to terminate the oral agreement; but how is an owner, if he is innocent of having made an agreement, or is unmindful that that which has been said or done may be held out as an agreement, to apprehend, unless he is put on notice, that there is something which, for his protection, should be repudiated or terminated? That which the statute provides maybe repudiated or terminated is the existence of an oral agreement, not a bare statement by the broker that he will be entitled, unsupported by an assertion of the agreement without which he can have no standing. There is no legal right in the broker unless there is an agreement; and there is no occasion under the law for an owner to make an answer of any sort to a writing from a broker unless the broker's position is fortified by an agreement. Further, there is no understandable reason why a broker, in giving the statutory notice, should not say that he claims an agreement if there was in fact one, unless he fears that the owner will repudiate or terminate the same  a motive that clashes directly with the legislative purpose in requiring the notice.
130 N.J.L. at 506-507, 33 A.2d 844.
The Court in Fontana held that plaintiff's letter to defendant failed to comply with the requirements imposed by the statute because it did not refer to a prior oral agreement between the parties even though it did describe the property and disclosed the price quoted by the broker to the prospective purchaser and plaintiff's usual commission percentage. In reversing a judgment for plaintiff and holding that a motion for directed verdict for defendant should have been granted, the Court declared:
... We think that the requirement of the statute  "a notice in writing, setting forth the terms of the oral agreement"  is not satisfied unless the owner is apprised that the terms which the notice contains are claimed by the broker to be the terms of an oral agreement between him and the owner.
130 N.J.L. at 508, 33 A.2d 844.
In Soloff v. Atlantic Coast Bldg. and Loan Assn., 10 N.J. Misc. 1150, 162 A. 718 (Sup.Ct. 1932) the court reversed a *460 judgment entered in favor of the broker upon the grounds that the letter sent by the broker did not comply with the statute of frauds because it merely identified the property, stated that the property had been submitted to a prospective purchaser and disclosed the commission expected by the broker. The court found the letter deficient in failing to make any reference to the alleged oral agreement, to disclose the selling price or to describe the broker's authority.
In Smith v. Cyprus Industrial Minerals Co., 178 N.J. Super. 7, 11, 427 A.2d 1114 (App.Div. 1981) the court affirmed a dismissal of a broker's suit for commissions as barred by the statute of frauds because the broker's letter to the owner "... was not sent within five days after the making of the alleged oral agreement with the owner nor did it set forth the terms of the oral agreement and the rate or amount of commission to be paid, as required by the statute...." In Smith the broker's letter merely identified the persons to whom the property had been shown and stated that the broker expected to be paid a commission upon consummation of a sale, lease or option.
In Myers v. Buff, 45 N.J. Super. 318, 321, 132 A.2d 543 (App.Div. 1957), the Appellate Division, in interpreting the statute of frauds in the light of the Fontana opinion, held:
It was settled by that case that the broker's notice to the owner, which is provided for by the statute, is fatally defective unless the owner is thereby apprised that he had agreed to pay the broker commissions. The notice need not use the word "agreement," but it must at least impliedly inform the owner of an agreement on his part to pay such commissions.
A divided court in Myers affirmed a judgment for the broker, holding that the broker's letter in that case complied with the statute by impliedly referring to the oral agreement. The broker's letter expressly mentioned that the action taken by the broker in quoting a specified price for the property to the prospective purchaser identified in the letter was taken "in accordance with our conversation." The broker's letter also set forth the broker's commission, how it was calculated and that the commission was added to the net per acre price sought by *461 the seller in order to reach the asking price quoted by the broker.
The letter of November 27, 1987 clearly fails to satisfy the statutory requirements of N.J.S.A. 25:1-9 as that statute has been interpreted in the Fontana, Soloff, Smith and Myers cases. The letter makes no reference whatsoever to any oral agreement between the parties or even to any conversation between the parties. The letter fails to disclose in any manner, either expressly or impliedly by reference, to the selling price or other terms, the authority allegedly granted to plaintiff by defendants with regard to the negotiations with Kimble. During oral argument of the motion, counsel for plaintiff quoted, without specifying the precise source, several Webster dictionary definitions of the term "negotiate" in support of his argument that the words "negotiated commission rate of six (6) per cent" contained in the November 27th letter were sufficient to impliedly inform Raho that plaintiff was relying upon on oral brokerage agreement. The dictionary definitions quoted by plaintiff's counsel are set forth below:
(1) To discuss with a view to finding terms of agreement; to bargain.
(2) To confer or discuss with a view to reaching agreement.
(3) To confer with another so as arrive at the settlement of some matter.
The third definition of the word "negotiate" quoted above may be found in Webster's Ninth New Collegiate Dictionary (1983). None of the above-quoted definitions support plaintiff's argument since they all refer to a process of discussion which, although intended to reach an agreement, may or may not succeed in that purpose. The word "negotiated" as used in the November 27th letter clearly does not imply that the parties have already reached agreement. Moreover, the format of the November 27th letter itself suggests that plaintiff, rather than relying upon an existing oral agreement, seeks the Rahos' approval of a written brokerage agreement. The letter contains no signature by any representative of plaintiff, but does set forth places for the signatures of both Mr. and Mrs. Raho, thereby apparently seeking their consent, rather than confirming *462 a prior oral agreement. Accordingly, the reference in the letter to a "negotiated commission rate of six (6) per cent of the negotiated selling price" is insufficient as a matter of law to place defendants on notice that plaintiff was relying upon a prior oral agreement.
If the letter of November 27, 1987 was the sole written notice sent by plaintiff to defendants, the defendants would clearly be entitled to summary judgment since that letter does not comply with the requirements of the statute of frauds, N.J.S.A. 25:1-9. However, although not referred to in the complaint or relied upon by plaintiff's counsel in his initial letter brief, the court must decide whether the letter of December 21, 1987 sent by plaintiff to defendants following an alleged oral modification or reconfirmation that day of the earlier oral agreement, raises a fact question as to compliance by plaintiff with N.J.S.A. 25:1-9. Prior to oral argument of this motion the court requested counsel for both parties to address that issue and authorized counsel to submit supplemental briefs on the issue. Plaintiff's counsel submitted a letter brief arguing that the December 21, 1987 letter satisfied the broker's obligation under the statute of frauds. Defendants' counsel argued in a supplemental letter brief that the December 21, 1987 letter, not being delivered to defendants within five days of the original alleged oral agreement made in November 1987, was insufficient as a matter of law to satisfy the requirements of the statute of frauds. For the reasons stated below the court concludes that the December 21, 1987 letter does in fact satisfy the requirements of the statute of frauds.
The December 21, 1987 letter, typed on the plaintiff's letterhead, reads as follows:
Michael F.P. & Deborah Raho
Edgehill Court
West Orange, New Jersey 07052
Re: Raho Residence
Glen Avenue
West Orange, New Jersey

*463 Dear Michael and Debbie,
I would like to confirm our telephone conversation today regarding the above captioned property.
I have no problem with you or your husband opening negotiations with Mr. John Kimble, whom I introduced to your property on November 27, 1987.
If I can be of any help in this matter, feel free to contact me, and also, I would appreciate any feedback of the outcome of your negotiations. Our commission agreement of November 27, 1987 is still applicable.
 Very truly yours,
 Linda E. Grabowski
 Sales Associate for
 R.A. Intile, Inc.
During oral argument counsel for Raho argued that the December 21 letter was insufficient as a matter of law to comply with the statute of frauds. He characterized the alleged oral agreements of November 26 and December 21 as constituting an "open listing" which the Supreme Court viewed with disfavor in McCann v. Biss, supra, 65 N.J. at 308, 322 A.2d 161. Raho's counsel further argued, relying on McCann, 65 N.J. at 309-310, 322 A.2d 161, that because this case involved an "open listing", the court should require that the written notice expressly place the seller on notice of the existence and terms of the alleged oral agreement of December 21; that the December 21 letter failed to do that and that it was, therefore, not unfair to deprive the broker of a commission. It was also counsel's position that McCann placed in doubt the continued viability of Myers v. Buff, supra.
These arguments are rejected. Initially, the court does not regard the alleged oral agreements between plaintiff and Raho to be an "open listing". An "open listing" is one in which the seller orally agrees to pay a commission to any broker who produces a ready, willing and able buyer. McCann v. Biss, supra, 65 N.J. at 306, 322 A.2d 161. Here, the alleged oral agreement limits the seller's obligation to pay a commission to a specific broker and then only if a sale is made to a single named customer of the broker to whom the seller has been introduced by the broker. Secondly, the McCann case *464 does not deal with the sufficiency of the broker's written notice, but only with the viability of a claim for tortious interference with the broker's economic advantage where the broker's claim for breach of contract was clearly barred by the statute of frauds because no written notice of an oral brokerage agreement had ever been served upon the seller. Finally, the Myers v. Buff case was neither expressly nor impliedly overruled or even questioned in the McCann opinion, and this court regards Myers as still expressing the appropriate standard to be applied in interpreting the legal sufficiency of the broker's written notice under the statute of frauds.
Counsel for the Raho defendants further argues that even under Myers v. Buff, supra, the December 21 notice is insufficient as a matter of law to satisfy the statute of frauds. Counsel points to the absence of words of "accord" in the December 21 letter and argues that such words are essential for the broker's notice to impliedly inform the seller of an oral agreement to pay a commission. Counsel relies upon the following excerpt from the Myers opinion for his argument:
The single question before us is whether the letter of January 25 impliedly apprises the defendant here that he had undertaken to pay plaintiff commissions. The critical clause in that letter as we read it, is Myers' opening statement: "In accordance with our conversation, we have quoted a price of $7400," etc. The word "accordance" signifies agreement, conformity or harmony. Hence the clause may mean (as we think it does) that Buff had stated in the conversation that he would sell the land to Freihofer for $7,400, and that Myers in conformity therewith had quoted to Freihofer the price of $7,400. Or it may possibly mean that the price of $7,400 was merely in harmony with some assertion of Buff, as, that he was willing to sell the land at $6,000 per acre net to him; in other words, that the price was built up by Myers out of a statement or statements Buff had made in the conversation. As we say, we are inclined to think that the import of the letter is that Buff at the conversation said Myers could quote a price of $7,400. This is the simple, more natural significance of the language. We feel that "in accordance with" is synonymous here, as it commonly is in letters, with "pursuant to," and that by this letter Buff was put on notice that he was being charged with having declared that Myers could offer the property to Freihofer at a figure of $7,400. (Emphasis included.)
45 N.J. Super. at 321-322, 132 A.2d 543.
Counsel's interpretation of the Myers opinion is rejected. Myers does not hold that words such as "accord' or "in accordance *465 with" must be set forth in the broker's notice in order for that notice to comply with the statute of frauds and to impliedly inform the seller of an oral brokerage agreement. There is no indication that the Myers court intended to establish any rigid or technical rule to determine whether a broker's notice is sufficient under the statute to impliedly confirm an oral agreement or that the broker is required to use any definite or explicit words to impliedly inform the seller of the existence and terms of an oral brokerage agreement. While the Myers court found that the words "in accordance with" contained in the broker's notice were sufficient in that case to satisfy the statute of frauds, the court stated the rules for construing the sufficiency of a broker's notice under the statute to be as follows:
In dealing with the sufficiency of a "notice," or a "memorandum or note," called for by the statute of frauds (N.J.S.A. 25:1-9; 25:1-5), we should not lose sight of the purpose of that statute, underlying its various provisions. Corbin has this to say on that point:
"What is that purpose? It is the prevention of successful fraud by inducing the enforcement of contracts that were never in fact made; it is not to create a loophole of escape for dishonest repudiators. Therefore, we should always be satisfied with `some note or memorandum' that is adequate, when considered with the admitted facts, the surrounding circumstances, and all explanatory and corroborative and rebutting evidence, to convince the court that there is no serious possibility of consummating a fraud by enforcement. When the mind of the court has reached such a conviction as that, it neither promotes justice nor lends respect to the statute to refuse enforcement because of informality in the memorandum or its incompleteness in detail." (Italics added.) 2 Corbin, Contracts 680 (1950).
45 N.J. Super. at 323, 132 A.2d 543.
See also, Stanchak v. Cliffside Pk. Lodge # 1527, L.O.M., 116 N.J. Super. 471, 478, 282 A.2d 775 (App.Div. 1971) where the court held:
Beyond satisfaction of the requirements of the statute, the writing must signify an engagement of the broker to sell the property on behalf of the owner. However, the writing need not expressly use language of authorization, see Clark v. Griffin, 95 N.J.L. 508 [113 A. 234] (E. & A. 1921), if authorization is fairly implied by the writing. In determining whether such implication is warranted from the words used in the writing, however, it is permissible, and sometimes, as here, essential to scrutinize the surrounding circumstances. (Citations omitted).
*466 The December 21, 1987 letter identifies the owners/sellers, the premises covered by the parties' understanding and the broker. While the letter does not state the rate or amount of commission it incorporates by reference the earlier letter of November 27, 1987 which was admittedly received by Raho prior to their receipt of the December 21, 1987 letter. Moreover, this letter clearly confirms a telephone conversation between the parties earlier that day and at least impliedly, if not expressly, refers to an alleged oral agreement pursuant to which the defendants were to open direct negotiations with Kimble and that if those negotiations produced a sale to Kimble of the Glen Avenue home, plaintiff was to receive the commission referred to in the November 27, 1987 letter. The last sentence of the December 21 letter does not merely state plaintiff's expectancy of a commission if a sale is made to Kimble, as counsel for Raho argued. Rather it speaks of "[o]ur commission agreement" and incorporates by reference the November 27 letter which clearly sets forth the rate of commission.
Implication of the existence of an oral brokerage agreement is also warranted by the surrounding circumstances. Among the facts considered by the court are the admissions by the Raho defendants that Grabowski obtained their agreement to have Mr. Raho meet with and show the Glen Avenue home to Kimble on November 27, 1987; that Intile accompanied Kimble during that inspection; that Kimble offered to buy the house for $900,000 during that visit; and that when Raho subsequently listed the Glen Avenue house with Degnan & Boyle, they excluded Kimble from the Degnan & Boyle listing agreement. While Raho has offered explanations for the meeting with Kimble at the Glen Avenue home on November 27, and for excluding Kimble from the Degnan & Boyle listing agreement, a jury would be free to reject such explanations and conclude that such facts corroborated Grabowski's claims as to the existence of an oral brokerage agreement. Thus, when considered with the admitted facts summarized above and the surrounding *467 circumstances, the court is satisfied that, while there is a question of fact as to whether the parties reconfirmed or modified an oral brokerage agreement on December 21, 1987, the letter of that date is sufficient written notice to satisfy the statute of frauds.
As in the case of the November 27 letter, the court concludes, based upon the certifications of the parties, that a genuine issue of fact exists as to whether the December 21, 1987 letter was received by Raho within five days of the alleged oral agreement of that date. Grabowski has certified that the December 21, 1987 letter was enclosed with the Christmas candy gift she delivered to the Llewellyn Park gatehouse for Raho on December 23, 1987. Mrs. Raho admits receipt of that Christmas gift but states that it was delivered on or about December 20, 1987. She also admits receipt of the December 21, 1987 letter which she states was delivered via ordinary mail a few days after its date. It will be for the jury to resolve these conflicts and determine whether the December 21, 1987 letter was in fact received by Raho within five days of the alleged oral agreement of that date. Alexander v. Rekoon, supra; I.S. Smick Lumber v. Hubschmidt, supra.
Although the December 21, 1987 letter makes no mention of an asking price, the court does not interpret Soloff v. Atlantic Coast Bldg. and Loan Assn., supra, as mandating that the broker's written notice must always refer to the asking price in order to comply with the statute of frauds. In Soloff the court held that the broker's written notice in that case failed to comply with the statute of frauds as a matter of law because it did not disclose either the selling price, an element defining the nature and extent of broker's authority, or the rate or amount of his commission, and, accordingly, failed to confirm "the terms of the oral agreement" as required by the statute.
In this case, however, Grabowski's failure to mention the Rahos' alleged asking price in the December 21, 1987 letter does not, as a matter of law, make that letter violative of the *468 requirements of the statute of frauds. Since under the terms of the alleged oral agreement, plaintiff was no longer to be involved in the negotiations with Kimble, except to furnish the Rahos with consulting services if and when such services were requested, and the Rahos were going to negotiate directly with Kimble, there was no need for Grabowski to refer to the selling price in order to confirm the nature and extent of plaintiff's authority as broker. Plaintiff had already introduced Raho to Kimble. There was no requirement that plaintiff participate in the negotiations to earn a commission. Corson v. Keane, 4 N.J. 221, 224-226, 72 A.2d 314 (1950); Houston v. Siebert, 129 N.J.L. 468, 472-473, 30 A.2d 35 (E. & A. 1943); Vreeland v. Vetterlein, 33 N.J.L. 247, 249 (Sup.Ct. 1869). As the court in Corson held:
A real estate broker is a special agent of the one who employs him. 12 C.J.S., Broker, p. 30, at 11. This is the established rule and has been so recognized in this State. See Austin J. Waldron, Inc., v. Cutley, 105 N.J. Eq. 586 [144 A. 447] (Ch. 1929); aff'd, 105 N.J. Eq. 586 [148 A. 916] (E. & A. 1929). The authority of such a special agent is circumscribed by the terms of his agency agreement and may be narrow or broad dependent upon the creative authority. His employment contract may require much or little activity upon his part. He may, by the terms of his employment, be required to effect a sale or merely produce a customer.
4 N.J. at 225, 72 A.2d 314.
Defendants argue that the November 27, 1987 letter is legally insufficient to constitute a valid notice of an oral brokerage agreement because it does not set forth the length of time during which the oral agreement was to remain in effect. The same argument applies to the December 21, 1987 letter which also contains no reference to the duration of the oral brokerage agreement allegedly made on that date. The issue which must then be resolved is whether a written notice which fails to mention the duration of the oral brokerage agreement violates the statute of frauds and renders the oral agreement unenforceable.
The resolution of this issue may be found in the language of the statute of frauds itself and in that line of cases *469 which hold that, in the absence of an agreement between the parties to the contrary, a broker is entitled to a commission when the broker is responsible for "... causing the seller to negotiate with a customer produced by the broker, who is ready, able and willing to perform, and where the transaction is later consummated without a substantial break in the ensuing negotiations." De Benedictis v. Gerechoff, 134 N.J. Super. 238, 242, 339 A.2d 225 (App.Div. 1975). Accord, Loeb v. Peter F. Pasbjerg & Co., 22 N.J. 95, 100-101, 123 A.2d 522 (1956); Joseph Hilton & Associates, Inc. v. Evans, 201 N.J. Super. 156, 169, 492 A.2d 1062 (App.Div. 1985); Fry v. Doyle, 167 N.J. Super. 486, 493-494, 401 A.2d 265 (App.Div. 1979), certif. den. 81 N.J. 287, 405 A.2d 831 (1979); Mack v. Revicki, 47 N.J. Super. 185, 192, 135 A.2d 569 (App.Div. 1957); The First New Hampshire Corp. v. Van Syckle, 37 N.J. Super. 469, 472, 117 A.2d 656 (App.Div. 1955). Even where the listing sets forth a selling price, and the ultimate sale is for a lesser price, the broker is ordinarily entitled to a commission where he or she furnishes the buyer, provided there has been no significant break in the negotiations and the final price is agreed upon by the seller and buyer. Loeb v. Peter F. Pasbjerg & Co., supra, at 100, 123 A.2d 522; Joseph Hilton & Associates, Inc. v. Evans, supra, at 169, 492 A.2d 1062.
The common law rule referred to above has been incorporated by the Legislature into N.J.S.A. 25:1-9 to the extent that the statute permits the broker to recover his commission under the terms of an oral agreement properly confirmed in writing and served upon the seller in compliance with the requirements of the statute even where the seller repudiates that agreement in writing if "... the broker or agent in good faith shall have entered into negotiations with a prospective customer, and such negotiations shall be pending at the time of the repudiation or termination of the oral agreement, and the sale or exchange is subsequently consummated between the owner and such customer ..." N.J.S.A. 25:1-9.
*470 Based upon the foregoing, the court holds that the absence of any provision in the broker's written notice as to the duration of the oral brokerage agreement does not render the oral agreement unenforceable under the statute of frauds. In this case it may be inferred from Grabowski's certification that, during the telephone call of December 21, she and Mrs. Raho did not discuss the length of time during which the alleged oral brokerage agreement would remain in effect and, accordingly, did not reach any agreement with respect thereto. Moreover, the sale was ultimately consummated by Raho with the customer introduced to them by plaintiff and no evidence has been offered suggesting that the sale by Raho to Kimble's actual or fictitious corporation, O. Realty Corp., was consummated after a substantial break in the negotiations.
Another legal issue to be resolved is whether a broker who has failed to properly confirm an oral brokerage agreement in writing within five days after its making (in this case, the alleged November 26, 1987 oral agreement) may nevertheless satisfy the requirements of the statute of frauds if that initial oral agreement is subsequently orally amended or merely reconfirmed orally by the parties and the broker then serves upon the seller a proper written notice of the terms of that oral agreement within five days of the subsequent oral amendment or oral reconfirmation of the prior oral agreement. This question was answered by our Supreme Court in Rossy v. Phillips, 3 N.J. 226, 69 A.2d 722 (1949).
In Rossy the defendant had orally listed her property for sale with plaintiff in July 1946 at a $25,000 selling price and agreed to a five percent commission. A listing agreement was never signed by defendant and plaintiff never confirmed the oral listing in writing. Plaintiff showed the premises to a prospective purchaser to whom defendant ultimately sold the property for $24,500. Plaintiff communicated the purchaser's offer in that amount to defendant on September 7, 1946 and advised defendant that she would owe him a five percent commission if *471 she accepted the offer. Defendant did accept the offer and plaintiff informed her he would send a letter confirming the oral agreement, which the broker did, but defendant refused to accept delivery of that letter and it was returned to plaintiff with the notation "Refused 9/11/46." In holding that the September 9, 1946 letter complied with the statute of frauds requiring reversal of an involuntary dismissal for defendant, the Court reasoned as follows:
In this connection we must not lose sight of the fact that the oral agreement or listing in July, 1946, not having been followed by timely service of a written notice of its terms, lost its efficacy as a basis for legal liability. Certainly a real estate agent or broker making an oral agreement which becomes ineffectual because not followed by timely notice, is not precluded thereby from entering into another oral agreement, whether upon the same or other terms, which may become effective by proper notice. To hold otherwise would require an artificial construction of the statute contrary to the purpose of its enactment.
3 N.J. at 230, 69 A.2d 722.
In this case, title to the Glen Avenue home was transferred to a corporation admittedly owned and controlled by Kimble known as O. Realty Corp. It appears from the certification of plaintiff's counsel that he arranged a search of the records of Secretary of State in August 1988 and learned that O. Realty Corp. is neither incorporated in New Jersey nor licensed as a foreign corporation to conduct business in this State. Plaintiff's counsel further asserts that in September 1988 he arranged for a search of the records of the Essex County Clerk which disclosed that O. Realty Corp. was not a registered trade name in Essex County. Based upon these searches, plaintiff's counsel argues that O. Realty Corp. is a fictitious name used by Kimble to take title to the Glen Avenue home. While the evidence offered by plaintiff would justify a jury in inferring that O. Realty Corp. is a fictitious name, that evidence is not conclusive since there is no evidence that plaintiff arranged to have a search made of the records of the Secretaries of State of the other forty-nine states where Kimble could have incorporated O. Realty Corp. It is clear that the December 21, 1987 letter makes no reference to O. Realty Corp. *472 However, counsel for Raho conceded at oral argument that such omission did not render plaintiff's contract claim for a commission unenforceable under the statute of frauds since Raho knew at the closing that O. Realty Corp. was owned and controlled by Kimble.[1]
For the foregoing reasons, the court holds that there are genuine issues of material fact as to the following: (1) whether Grabowski and the Raho defendants entered into an oral brokerage agreement on November 26, 1987, and if so, what the terms of such oral agreement were; (2) whether that oral agreement was orally modified or orally reconfirmed during a telephone conversation between Grabowski and Mrs. Raho on *473 December 21, 1987, and if so, what the terms of such oral modification or reconfirmation were; (3) whether the letter of December 21, 1987 accurately states the terms of an agreement between the parties reached orally on that date; and (4) whether the letter of December 21, 1987 was received by the Raho defendants within five days of December 21, 1987. Accordingly, the motion of the Raho defendants for summary judgment as to the first count of the complaint is denied.
Since plaintiff's claim for breach of the alleged oral agreement of December 21, 1987 is not barred by the six year statute of limitations contained in N.J.S.A. 2A:14-1 and since amendments to pleadings are to be granted freely in the interests of justice pursuant to R. 4:9-1, the court will sua sponte permit the first count of the complaint to be deemed amended to assert a claim by plaintiff for breach of the alleged oral agreement of December 21, 1987 and to include allegations that such alleged oral agreement was confirmed in a writing which was received by the Raho defendants within five days of the oral agreement in compliance with N.J.S.A. 25:1-9 and was never repudiated in writing by the Raho defendants. Plaintiff's motion to amend the complaint to include an allegation of personal service of the November 27, 1987 letter will also be granted.
Remaining to be resolved is whether the Raho defendants are entitled to summary judgment on the second and third counts of the complaint which charge them with conspiracy to defraud and tortious interference with plaintiff's contractual rights and prospective business advantage.
If the jury finds that there was no oral brokerage agreement made by plaintiff with said defendants on December 21, 1987 or that the written notice did not accurately confirm such alleged oral agreement or was not received by defendants within five days, the claims for common law fraud and tortious interference with plaintiff's contractual rights and prospective economic or business advantage would both be barred by the statute of frauds. McCann v. Biss, supra, 65 N.J. at 310, 322 A.2d 161; *474 Smith v. Cyprus Industrial Minerals Co., supra, 178 N.J. Super. at 12, 427 A.2d 1114.
With respect to the tortious interference claim, the Supreme Court in McCann v. Biss, supra, 65 N.J. at 310, 322 A.2d 161, ruled:
We are of the opinion that, as a general proposition, a broker, who may not recover commissions from a seller directly by reason of the statute of frauds, may not accomplish the same result indirectly by a claim against the seller for wrongful interference with the broker's reasonable expectancy of economic benefit. That expected benefit has to be the payment of commission by the seller, but the basis thereof is in turn the oral agreement between broker and seller which is void and unenforceable by reason of the statute. Such a claim actually seeks to enforce the oral agreement, amounts to an effort to evade the statute, and like a claim in quantum meruit, would substantially undercut the law and its spirit. It cannot be allowed.
A similar rationale was followed by the Appellate Division in the Smith case in dismissing the broker's common law fraud claim:
Though clothed in the garb of alleged misrepresentation, the second count is a palpable attempt to circumvent the statute of frauds. In essence it charges that the seller made an oral agreement or representation to pay a commission but then failed to do so. Plaintiff may not accomplish indirectly that which it cannot do directly. Cf. McCann v. Biss, 65 N.J. 301 [322 A.2d 161] (1974).
178 N.J. Super. at 12, 427 A.2d 1114.
If, however, the jury sustains the plaintiff's breach of contract claim, the issue then to be decided is whether plaintiff may also seek recovery of compensatory and punitive damages on the fraud and tortious interference claims. The only case which I have found treating with the subject is Flaster v. Lincoln Tidewater Terminals, 124 N.J.L. 69, 10 A.2d 730 (E. & A. 1939) which held that claims of fraud and tortious interference with the broker's contractual rights and his reasonable expectancy of economic benefit would not lie against the party with whom the broker also claims to have a contractual relationship. In Flaster plaintiff appealed from a judgment of non-suit by the trial court dismissing his claims at the conclusion of his proofs. Plaintiff alleged that the fraud and tortious interference claims should have been submitted to the jury. In *475 affirming the lower court's judgment dismissing such claims, the Court reasoned:
The suit here is against those with whom plaintiff asserts he had contractual relations. If he failed to prove a contract, he had no standing, and, if he proved a contract, his recovery would be for breach of contract. If a stranger intermeddled and defeated his right under the contract, a tort might be committed. The conduct established by the proof did not amount to unjustifiable interference with his business, even if it be conceded there was an attempt to consummate the deal in such manner as to avoid payment of commissions. If he was in position to claim commissions, nothing the parties did could defeat such claim; if he did not have such standing, they were not precluded from proceeding with negotiations as they desired.
124 N.J.L. at 72, 10 A.2d 730.
Whether Flaster still represents New Jersey law as to the validity a broker's claims for common law fraud and tortious interference against the seller need not be resolved in this case because the court finds that plaintiff, who will have the burden of proof at trial on these issues, has failed to demonstrate that there are genuine issues of fact on either claim sufficient to defeat the motion of the Raho defendants on these claims. The court will examine the proofs on each claim separately.
With respect to the common law fraud claim against the Raho defendants, plaintiff has the burden of proving that claim by clear and convincing evidence; fraud will not be presumed. Stochastic Decisions v. DiDomenico, 236 N.J. Super. 388, 395, 565 A.2d 1133 (App.Div. 1989); Albright v. Burns, 206 N.J. Super. 625, 636, 503 A.2d 386 (App.Div. 1986); Williams v. Witt, 98 N.J. Super. 1, 4, 235 A.2d 902 (App.Div. 1967). The elements of a claim for common law fraud are (1) that there was a material misrepresentation to plaintiff of a present or past fact; (2) that the defendant made such representation knowing it was false and with the intent that it be relied upon; and (3) that plaintiff relied upon such representation to his detriment. Jewish Center of Sussex Cty. v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981); Stochastic Decisions v. DiDomenico, supra, 236 N.J. Super. at 395, 565 A.2d 1133.
*476 Plaintiff has presented no evidence to support the common law fraud claim. The Raho defendants certainly did not go behind plaintiff's back and surreptitiously negotiate with Kimble. Rather they were authorized by plaintiff to negotiate directly with Kimble. There is no evidence that Raho suggested that Kimble take title in the name of O. Realty Corp. as a means of avoiding liability to plaintiff for brokerage commissions on the sale of the Glen Avenue home or that the Raho defendants agreed to reduce the selling price to Kimble by all or part of the commission allegedly owing to plaintiff and encouraged or agreed upon the use of a dummy corporation founded or a fictitious name used by Kimble to take title as a means of defrauding plaintiff of the commission due it on the sale. There is no evidence in the record that the Raho defendants made any misrepresentation of any present or past fact to plaintiff knowing that their representation was false and with the intent that plaintiff rely upon such representation, nor is there any evidence that plaintiff relied upon any misrepresentation by the Raho defendants to its detriment. Accordingly, the common law fraud claim contained in the second count of the plaintiff's complaint will be dismissed as to the Raho defendants with prejudice.
Plaintiff also has the burden of proof on its claim against the Raho defendants for tortious interference with its contract rights or prospective economic or business advantage. McLaughlin v. Weichert Co. Realtors, 218 N.J. Super. 63, 67, 526 A.2d 1119 (App.Div. 1987). The elements of a tortious interference claim were stated in Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173, 185-186, 384 A.2d 859 (App.Div. 1978), certif. den. 77 N.J. 510, 391 A.2d 523 (1978) as follows:
The law not only protects one from unjustifiable interference with one's contract by another but it also protects a person's interest in reasonable expectation of economic advantage. Harris v. Perl, 41 N.J. 455, 462 [197 A.2d 359] (1964); Mayflower Industries v. Thor Corp., 15 N.J. Super. 337, 339 [83 A.2d 366] (Ch.Div. 1951), aff'd o.b. 9 N.J. 605 [89 A.2d 242] (1952). One who unlawfully interferes with the interest will be held liable for the damage sustained by the victim of that interference. Mayflower Industries v. Thor *477 Corp., supra at 339 [83 A.2d 366]. Accordingly, the right to pursue the real estate brokerage business is one of the property rights or interests which the law protects against unlawful interference. Louis Kamm, Inc. v. Flink, 113 N.J.L. 582 [175 A. 62] (E. & A. 1934). If unlawful means are employed, such as fraud or intimidation, or if the means consist of acting without justifiable cause (malice) so that a person suffers injury to his business, he may secure redress for this damage. McCue v. Deppert, 21 N.J. Super. 591 [91 A.2d 503] (App.Div. 1952). There must be proof not only of the unlawful, intentional interference with the prospect of reasonable expectation of economic advantage, but also proof that if there had been no interference there was a reasonable probability that the victim of the interference would have received the anticipated economic benefits. Myers v. Arcadio, Inc., 73 N.J. Super. 493, 498 [180 A.2d 329] (App.Div. 1962):
There must be a showing by plaintiff of both interference by defendant and that the conduct of the defendant was unconscionable, that is, that such conduct transgressed generally accepted standards of morality. McLaughlin v. Weichert Co. Realtors, supra, 218 N.J. Super. at 67, 526 A.2d 1119.
The record is barren of any evidence which would support the tortious interference claim against the Raho defendants. Indeed, under the circumstances there could have been no interference by the Raho defendants with plaintiff's contract rights or prospective business advantage because, assuming the jury finds that there was an enforceable oral agreement between plaintiff and Raho, those defendants, in closing title with Kimble and his company, O. Realty Corp., were acting in furtherance of, rather than interfering with, plaintiff's contract rights to earn a commission. Accordingly, the tortious interference claim contained in the third count of the complaint is dismissed with prejudice.
In granting the motion of the Raho defendants for partial summary judgment dismissing the second and third counts of the complaint as against those defendants, no opinion is expressed as to the validity of those claims against Kimble and O. Realty Corp., nor does the court express any opinion as to the right of plaintiff to pierce the corporate veil of O. Realty Corp. in its effort to obtain relief against Kimble on grounds of fraud by that defendant. See State, Dept. of Environ. Protect. v. *478 Ventron Corp., 94 N.J. 473, 500, 468 A.2d 150 (1983). Lyon v. Barrett, 89 N.J. 294, 300, 445 A.2d 1153 (1982); Telis v. Telis, 132 N.J. Eq. 25, 29, 26 A.2d 249 (E. & A. 1942); Stochastic Decisions v. DiDomenico, supra, 236 N.J. Super. at 393-394, 565 A.2d 1133.
Counsel for plaintiff will submit an order in conformity with the rulings contained in this opinion.
NOTES
[1] The only cases disclosed in my research which bear upon the obligation of a seller for commission when title is taken in a corporation rather than in the individual name of the broker's customer are Feist & Feist v. Bloomfield Bank & Trust Co., 120 N.J.L. 221, 198 A. 827 (E. & A. 1938) and Breen v. Debron, 10 N.J. Super. 167, 76 A.2d 837 (App.Div. 1950). Both cases are factually distinguishable from this case since they involved sales to persons not named in or contemplated by the written confirmations of the oral brokerage agreement.

In the absence of a concession by the seller that the broker would be entitled to a commission in such circumstances, the court concludes that the preferred rule is that where a real estate broker introduces the seller to a prospective purchaser pursuant to an oral brokerage agreement which is confirmed properly in writing by the broker pursuant to N.J.S.A. 25:1-9, and the seller ultimately consummates the sale to the broker's customer, the seller should not be able to avoid a contractual obligation to pay the broker a commission merely because the buyer decides to take title in the name of a dummy corporation formed for the purpose or in the name of an existing corporation which the purchaser owns and controls. To hold otherwise would place the broker at the mercy of an unscrupulous seller and buyer. By agreeing among themselves to adjust the selling price, the buyer and seller could share the amount which should otherwise be paid to the broker as a commission by having a dummy corporation or an existing corporation owned and controlled by the buyer take title. The broker would normally be unable to obtain clear and convincing evidence of such a fraudulent conspiracy between buyer and seller since the selling price would usually result from direct oral negotiations solely between seller and purchaser. Moreover, it should make no difference at all to the seller whether the broker's customer decides to take title in his or her individual name or in the name of a corporation controlled by the purchaser, and such a decision should have no bearing on the broker's right to earn a commission on the sale.