846 A.2d 633 (2004)
368 N.J. Super. 382
COLDWELL BANKER COMMERCIAL/FEIST & FEIST REALTY CORP., and Resource Realty of Central Jersey, Plaintiffs-Respondents,
v.
BLANCKE P.W. L.L.C., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued March 15, 2004.
Decided April 26, 2004.
Peter J. Zipp, Monroe Tp., argued the cause for appellant (Zipp & Tannenbaum, *634 attorneys; Mr. Zipp and Paul Tannenbaum, on the brief).
Philip Elberg, Newark, argued the cause for respondent (Medvin & Elberg, attorneys; Mr. Elberg, on the brief).
Before Judges HAVEY, NEWMAN and FALL.
The opinion of the court was delivered by
NEWMAN, J.A.D.
This appeal concerns a real estate broker's commission on a lease of commercial property. The trial court entered a judgment of $630,000 in favor of plaintiffs, the real estate brokers. We reverse, concluding that plaintiffs failed to comply with the statute of frauds, N.J.S.A. 25:1-16, to secure an enforceable agreement to pay a real estate commission and remand for plaintiffs to pursue recovery on a quantum meruit basis.
The relevant facts may be summarized as follows. Adam Glickman was a commercial real estate broker of more than twenty years experience and was with plaintiff Coldwell Banker Commercial/Feist & Feist Realty Corp. Jay Cadigan, manager for Manheim Auctions, told Glickman that Manheim was seeking another location for the business. Manheim was also known as ADT Automotive. Manheim required a location near the ports, with access to the New Jersey Turnpike, and ninety or a hundred acres to park thousands of cars.
Glickman called his long-time friend and fellow broker, Jack Kennedy of plaintiff Resource Realty of Central Jersey, because Kennedy had more experience with industrial land. Cadigan told Glickman and Kennedy that he was interested in a particular property that had just been sold at auction. Cadigan told Glickman the name of the broker. Glickman learned that the property had been purchased by defendant Blancke, and that the leasing agent was John Westerhold. Westerhold and Mickey Palin owned the property under the name Blancke P.W., L.L.C. which stood for "Palin/Westerhold." Either Glickman or Kennedy called Westerhold and arranged for Cadigan to tour the property in May 2001.
Over the next several weeks, the brokers and Cadigan met again twice with Westerhold to discuss possible engineering and maintenance aspects of the property. After the third meeting, in "late June," Glickman said that he told Westerhold, as the leasing agent for defendant, that "the real estate brokerage commission for the two firms is to be a total of five percent" and that they "expect to be paid on any lease extensions and renewals, et cetera." According to Glickman, Westerhold "said he understood and he was in agreement." Immediately afterwards, Glickman sent Kennedy at Resource Realty a letter by facsimile transmission (fax) and "hard copy" stating that the two firms would split the commission equally. A "[d]ay or two or three" later, on June 26, 2001, Glickman sent Westerhold the following letter:
Thanks for your time yesterday so that Jack Kennedy and I could introduce you to Brad Burke and Charles McClung of Manheim Auctions at the above referenced property.
As you and I agreed to on the phone today, should Manheim Auction lease the building and/or the land, COLDWELL BANKER COMMERCIAL FEIST & FEIST REALTY CORP. shall be entitled to a Real Estate Brokerage Commission of five (5%) percent of the gross aggregate rental. This shall apply to any renewals, extensions, revisions, options or taking of additional space as well as leasing or purchasing *635 other property from Palin Enterprises. In the event of a sale, the commission due is to be five (5%) percent of the sales price.
In his deposition, Glickman stated that he sent this letter by "[h]ard copy and fax." Westerhold admitted that he received this letter, and that he did not respond in writing.
On July 19, 2001, Glickman sent the following letter to Westerhold:
Jay Cadigan of Manheim Auto Sales called me this morning to update me.
As we both know, there have been a number of face to face meetings with executives of Manheim as well as the parent company, Cox Communications. We have been coordinating this matter since May 30, 2001 with various parties.
There have been phone conversations between the prospective tenant and the Brokers (Resource Realty of NJ and COLDWELL BANKER COMMERCIAL FEIST & FEIST REALTY CORP.) as well as direct conversations with you.
As we agreed on the phone this morning, the ownership will not sign a lease before a Brokerage Commission Agreement is signed with COLDWELL BANKER COMMERCIAL FEIST & FEIST REALTY CORP. and Resource Realty of NJ. Of course, the Brokers will be given copies of any executed lease.
The bottom of the letter had an "Agreed to and Accepted" signature line. Glickman never received an executed response.
Westerhold testified in a deposition that he repeatedly told "the brokers" in response that Blancke would not agree to any commission arrangement "until we knew what the terms of the transaction were going to be and who the entity was and what the financial statements of the tenant were." He said it was the company's practice not to enter into a commission agreement "until a lease is done," because until the lease was "signed" they did not know its terms or the financial condition of the lessee, which he considered "material information needed to enter into a commission agreement."
In "late July" Westerhold gave the brokers an original draft of the lease. The lease stated:
The Landlord and Tenant mutually represent to each other that Coldwell Banker Commercial/Feist Realty Corp[.] and Resource Realty of New Jersey, negotiated and consummated the within transaction and that neither party dealt with any other broker in connection with the within Lease, it being understood and agreed that the Landlord shall be responsible, at its sole cost and expense, to pay the real estate brokerage in connection with this Lease transaction. Landlord agrees to indemnify, defend and save harmless Tenant in connection with the claims of any real estate brokers claiming commissions in connection with the within transaction and claiming authority from the Landlord. Tenant agrees to indemnify, defend and save harmless Landlord in connection with claims of any real estate brokers claiming commissions in connection with the within transaction and claiming authority from the Tenant.
Glickman testified that when he received the draft he thought "okay, there's time to... get the brokerage agreement" because "[t]he deal still has a ways to go" and the parties still were "not together on the numbers." Glickman and Kennedy said that the brokers played no role in negotiating the lease and structuring the business aspects. He said they were "told to stay away."
*636 When asked why he never sent a commission agreement after speaking to Westerhold in June, Glickman replied, "I was lax."
Glickman learned that the lease was executed on October 1, 2001. Several days later, Glickman and Kennedy met with Palin and Westerhold. Palin "did not want to talk about the real estate brokerage commission." A second and third meeting followed shortly thereafter, and Glickman brought a commission agreement to these meetings. It is unclear whether the specific terms of the agreement were discussed. Palin offered a commission of $300,000 "over a period of time," which Glickman rejected.
On October 9, 2001, Glickman and Kennedy sent by hand delivery the following letter to Palin and Westerhold:
We are glad that we were able to assist you in pulling together a long term, net lease with subject tenant on your property in Linden.
At John's recommendation, we deferred submitting our real estate brokerage agreement. We did not object to that approach, based upon the assurance that as brokers we would receive a full real estate brokerage commission.
We were comforted by several events the naming of our respective firms as the real estate brokers of record in the lease (article 41, page 37) and the five percent (5%) letter sent by Adam Glickman following a discussion about commission dated June 26, 2001.
We are submitting for your review and consideration a commission agreement, covering those terms and conditions ordinarily used in such transactions, which would have been resolved prior to lease execution, had we been afforded an opportunity to do so. We feel that this should be a baseline for our agreement, protecting our position.
Notably, the lease is for an initial term of twelve (12) years with a base, net contractual value of:

$12,600,000.00
The lease includes a provision wherein the rentals from years five (5) through twelve (12) will be increased annually by the consumer price index (CPI) which can not be calculated at this time but if it amounts to two and one half percent (2 1/2%) per year it adds over one million dollars to the lease value.
The ten (10) year renewal starting out in the year 2013 could provide another thirteen (13) million dollars to the valuei.e. an agreement in the twenty-five (25) million dollar range (all projections on the conservative side).
Naturally, we are as anxious as you are to reach satisfactory resolution of this matter. Thank you for your assistance and cooperation throughout.
Attached to the letter was a formal commission agreement. The agreement provided that defendant would pay plaintiff a five percent commission on the gross aggregate rentals for the term of the lease payable in full on the commencement date of the lease. It also provided for payment of a further five percent commission if the tenant "remains in possession beyond the original term of the lease, and/or arranges to take additional space and/or takes an expansion of the premises, whether by new lease agreement, modification or extension of the lease (including month to month tenancies) or by any other form." In addition, if at any time the tenant purchased the property, defendant was to pay plaintiff a commission of five percent of the sales price less a credit for any commissions paid to plaintiff for the unexpired term of the lease, which was specified as *637 the term from the day of closing to the end of the tenant's existing lease.
On October 15, 2001, Feist and Resource Realty sent to Blancke via hand delivery two separate invoices for $315,000 each.
Kennedy admitted in his deposition that no commission agreement had existed when they sent the October 9, 2001, letter. Kennedy and Westerhold continued to discuss possible arrangements regarding the commission. Glickman did not participate in these discussions, but Kennedy related their substance to him. Westerhold offered a commission of $400,000 over a four-year period, but that offer was rejected by Glickman and also by the president and broker of plaintiff Resource Realty, a man named Hettler.
In his deposition, Glickman agreed that he had never attempted to send Blancke a commission agreement prior to the execution of the lease, and that the lease was signed before any commission agreement was executed. Glickman said that he was "lulled ... into a false sense of security by having in [his] hands a draft of the lease... where the brokerage firms are in the lease." He believed he was entitled to a five-percent commission based on "the verbal agreement" with Westerhold and the fact that the brokers were mentioned in the lease. Glickman said he expected to be paid "upon the tenant's taking occupancy to the property," but admitted that he and Westerhold had never agreed to such an arrangement. He also admitted that the determination of when payment would be made was "an important term in a commission agreement."
The trial court found that Glickman's letter of June 26, 2001 satisfied the statute of frauds and plaintiffs were entitled to a commission. The letter "refer[red] to a prior ... oral agreement" and "clearly" stated the commission. The court found that defendant "admit[ted] it received a letter within five days of the agreement." The court questioned Westerhold's veracity in contending that he could not remember any discussions relating to a commission agreement or its terms. Westerhold "was a sophisticated dealer in real estate" who "should have been well familiar with the statute and the dealings with realtors." His oral rejection of the writing "fail[ed] as a matter of law." The court concluded:
All that was required was a letter. It is entirely reasonable to require the defendant, particularly principals of this experience, or within these sort of real estate deals and investments, to know they had to repudiate in writing or be bound by the letter. They failed to do so. As such, they are bound by its terms.
In support of its motion for reconsideration, defendant submitted a certification by Westerhold that he had "no recollection of receiving and/or reviewing a copy of the June 26, 2001, correspondence on June 26, 2001" and no recollection of when he received or reviewed it. The certification also stated, however, that both "before and after" he received the letter, Westerhold told Glickman that he was unable to enter into a commission agreement until after the terms of the underlying leasing deal were known.
At oral argument on the reconsideration motion, defendant argued that a faxed notice was insufficient under the statute and that the court "can't hold Mr. Westerholtz [sic] to a standard to which the brokers themselves did not comply." Defendant's attorney asserted that the decision in C & J Colonial Realty, Inc. v. Poughkeepsie Sav. Bank, FSB, 355 N.J.Super. 444, 810 A.2d 1086 (App.Div.2002), certif. denied, 176 N.J. 73, 819 A.2d 1188 (2003), had "changed the law" with respect to the insufficiency of a faxed notice in satisfying the statute of frauds.
*638 The court again questioned Westerhold's credibility because it interpreted Westerhold's certification as "for the first, [sic] time challeng[ing] the issue of ever receiving this notice." The court found that "no new evidence" had been presented, and said that the court had considered C & J Colonial Realty in its decision. The court again decided that as "an experienced realtor" Westerhold should have known that "he had an obligation to respond in writing if he was objecting to the recitation of the oral agreement."
On appeal, defendant raises the following issues for our consideration:
POINT I
SUBSTANTIAL QUESTIONS OF MATERIAL FACT EXIST AS TO WHETHER OR NOT THERE WAS A "PRIOR ORAL AGREEMENT" BETWEEN THE PARTIES, AS REQUIRED BY N.J.S.A. 25:1-16d. THE MOTION JUDGE'S LEGAL CONCLUSION THAT PLAINTIFFS MERELY HAD TO NOTIFY BLANCKE, IN WRITING, ABOUT AN ALLEGED PRIOR ORAL AGREEMENT WAS ERRONEOUS AS A MATTER OF LAW.
A. Substantial questions of material fact exist whether or not an oral agreement was entered into between Mr. Glickman and Mr. Westerhold around June 26, 2001.
B. The motion judge's interpretation of the oral agreement exception to the statute of frauds is erroneous as a matter of law.
C. Feist & Feist Realty Corp. v. Dockside Urban Renewal Corp., 255 N.J.Super. 100, 604 A.2d 653 (Law Div.1992) is not relevant to this case.
POINT II
SUBSTANTIAL QUESTIONS OF MATERIAL FACT EXIST AS TO WHETHER OR NOT BLANCKE WAS SERVED WITH THE JUNE 26, 2001, LETTER WITHIN FIVE DAYS OF THE ALLEGED "PRIOR ORAL AGREEMENT." SERVICE OF THE JUNE 26, 2001, LETTER BY FACSIMILE WAS INADEQUATE FOR PURPOSES OF N.J.S.A. 25:1-16e AS A MATTER OF LAW.
A. Substantial questions of material fact exist as to whether Blancke was served with the June 26, 2001, letter within five days of the alleged oral agreement, as required by N.J.S.A. 25:1-16d.
B. Plaintiffs' service of the June 26, 2001, letter did not comply with N.J.S.A. 25:1-16e as a matter of law.
POINT III
IN THE EVENT THAT THE ORDER GRANTING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT IS REVERSED, THE COURT'S JANUARY 10, 2003, ORDER DENYING BLANCKE'S MOTION FOR AN ORDER IN AID OF LITIGANT'S RIGHTS AND FOR RECONSIDERATION AND/OR TO BAR DISCOVERY SHOULD ALSO BE REVERSED.
We need only discuss Point IIB. because we are satisfied that plaintiffs' service of the June 26, 2001 letter did not comply with N.J.S.A. 25:1-16(e) as a matter of law.
Defendant argues that the trial court's decision to grant summary judgment to plaintiffs was erroneous because as a matter of law a faxed letter fails to satisfy the notice requirements of the statute of frauds. We agree.
The statute of frauds requires that the notice provided by a broker to entitle it to a commission under section (d) "shall be served either personally, or by registered or certified mail, at the last known address *639 of the person to be served." N.J.S.A. 25:1-16(e). It is undisputed that Glickman never personally served the June 26, 2001, letter on defendant, or sent it by registered or certified mail. The only evidence in the record indicates that the letter was sent by fax and, possibly, ordinary mail.
The trial court's initial decision made no reference to the type of service and did not discuss whether a notice faxed to a principal is sufficient to entitle a real estate broker to a commission under section (d). In its reconsideration of defendant's motion, the court indicated it had already considered the issue. The court stated that defendant had presented "no new evidence," and that it already had considered the case of C & J Colonial Realty, Inc., supra, on which defendant relied to support its claim that faxed service was insufficient under the statute. The court reiterated its prior holding that the statute required Westerhold to respond in writing if he rejected the terms of the oral agreement as set forth in the realtor's notice.
Because neither the initial opinion nor the court's opinion after reconsideration discussed the significance of a faxed notice under the statute, it is unclear whether the court rejected the motion on the basis that the court already had considered the issue, or because the court did not consider the circumstance to be significant. Regardless, it is clear that the trial court believed that, having received actual notice, defendant was required to respond in writing and could not rely on an oral rejection.
"Strict compliance with the statute of frauds is essential for a broker to recover a commission for the sale of real estate." C & J Colonial Realty, Inc., supra, 355 N.J.Super. at 473, 810 A.2d at 1104. The statutes of frauds are designed "to protect the public from fraud, incompetence, misinterpretation, sharp or unconscionable practice." Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 553, 236 A.2d 843, 856 (1967). Our Supreme Court has long disapproved of business methods which rest on a broker's "hopes" that a commission" will be voluntarily paid even though there is no legal obligation to do so," and their wish "to avoid the possibility of the refusal of an owner to sign at the outset a document of authority the full import of which the latter may not be sure." McCann v. Biss, 65 N.J. 301, 308, 322 A.2d 161, 165 (1974). Here, all the witnesses agreed that no formal commission agreement had been signed. Defendant refused to sign one. The statute nevertheless provided a clear, unmistakable, and very simple means for the brokers to protect themselves by sending Westerhold a letter that accorded with the requirements of the statute.
The dispute in this case points up precisely why the broker must be held to strict compliance with the statute. The trial court's holding that actual notice of a broker's intent to seek a commission is sufficient ignores a central purpose of the statute. The statute goes beyond whether the principal received actual notice of the broker's intent to claim a commission. It also clarifies which claims or actions by a broker the principal is required to reject in writing. In doing so, the statute provides a level of certainty for both parties, but only if its provisions are strictly applied by the courts.
In the course of searching for a buyer or seller for real property, a principal may have numerous contacts with many brokers. Some of the contact may be verbal, some written. If a principal must decide anew upon each contact with each broker whether a written response is required, then the statute's purposes are partially eroded. The trial court's decision required the principal to act in accordance with the statute notwithstanding the broker's *640 undisputed failure to do so. Such a ruling removes the statute's protection for the principal because a principal would be unable to know under what conditions it must provide a written repudiation of the broker's notice.
Despite the prevalent use of fax machines for business purposes, the Legislature did not include that option as a method of service when it amended the statute in 1996. Faxes do not afford the same certainty of delivery as certified mail or personal service, and do not provide a means to determine the actual recipient of the fax. Unlike service effected by certified mail or hand delivery, the recipient of a fax is always a machine, not an individual. Without further personal verification, the sender has no way of knowing that the fax was ever removed from the machine and no knowledge of which individual actually received it. Ordinary mail service, especially upon a corporation, has similar deficiencies. Without verification, the sender has no means of knowing that the mail actually arrived at its destination. The actual recipient of the letter from the hands of the postal service is unknown to the sender, and it might never have reached the intended recipient. The methods of personal service, certified mail and registered mail, overcome this deficiency by providing verification that the notice reached its destination and the name of the individual who received it.
Plaintiffs argue that a series of cases have held that technical noncompliance with service requirements is insufficient to defeat an obligation to render payment. For example, plaintiffs contend that in R.A. Intile Realty Co. v. Raho, 259 N.J.Super. 438, 614 A.2d 167 (Law Div. 1992), "the motion judge held that once a party acknowledged receiving the notice it could not complain that it was delivered the wrong way."
Not so. The issue before the court in R.A. Intile Realty Co. was whether there existed a question of fact as to whether the method used by the broker satisfied the requirements for personal service. Id. at 454, 614 A.2d at 174-75. The broker had certified that she finalized an oral agreement on the telephone with the defendants, and the next day she prepared a letter based on the agreement and hand delivered it to the security guard at the gatehouse of the defendants' gated community, with instructions to inform the defendants that the letter was there for them. Id. at 457-58, 614 A.2d at 176-77. The broker also certified that one of the defendants had acknowledged receipt of the letter in telephone calls over the next few days. Id. at 458, 614 A.2d at 176.
Under those facts, the court declined to grant the defendants summary judgment on the basis that the notice was not served according to the statute. Ibid. The court did not hold that actual notice was sufficient to meet the requirements of the statute but, rather, that the factual circumstances did not preclude a finding that the personal service requirement of the statute had been met.
In reaching its decision, the court referred to "the law of common sense" that generally deemed receipt of a statutorily mandated written notice within the time period provided by the statute to have complied with the statute, even when the notice was not served in the manner prescribed. Id. at 457, 614 A.2d at 176. But commenting specifically on the statute of frauds, the court had this to say:
Where the statute requires either personal service or service by registered mail, the Legislature could not have intended that the broker may satisfy the statute by sending his written notice via ordinary mail, thereby having a jury determine whether delivery was in fact *641 made upon the seller by the United States Postal Service. By permitting the broker to serve the written notice "personally" upon the seller, the statute plainly requires that the broker or an employee or other agent of the broker must "personally" deliver the written notice by hand directly to the seller. The statute thus provides for two alternative methods of positive proof that the seller in fact received the written notice within the five day statutory period: (1) testimony by the broker or the broker's agent or employee that service was made "personally" on the seller or (2) a signed receipt obtained from the seller by the postal carrier when registered mail is used.
[Id. at 456, 614 A.2d at 176.]
The court recognized that the Legislature could not have intended to create a situation whereby a jury would have to determine on a regular basis whether delivery upon the seller or principal was in fact accomplished.
Plaintiffs also cite Alexander v. Rekoon, 104 N.J.L. 1, 139 A. 796 (Sup.Ct.1927), in which the court held that service by ordinary mail was sufficient for a broker to collect a sales commission. That decision was decided long before the current statute came into existence and is of no assistance in deciding the issue before us.
Plaintiffs refer to one case that discusses the doctrine of substantial compliance in the context of the affidavit of merit statute, Galik v. Clara Maass Med. Ctr., 167 N.J., 341, 771 A.2d 1141 (2001), and another that holds that actual service of a mechanic's notice of intention is sufficient, I.S. Smick Lumber v. Hubschmidt, 177 N.J.Super. 131, 425 A.2d 709 (Law Div. 1980), aff'd o.b., 182 N.J.Super. 306, 307, 440 A.2d 1160 (App.Div.1982). Neither of these cases present comparable circumstances. Both types of notice raise due process issues. A mechanic's notice of intention to place a lien on a homeowner's property must comply with the constitutional obligation to provide the homeowner with notice and an opportunity to be heard. Id. at 136, 425 A.2d at 711. In such conditions, actual notice "is or ought to be the best notice." Ibid.
The substantial compliance doctrine is designed to avoid the rejection of a legitimate legal claim solely on a technical basis. Galik, supra, 167 N.J. at 352, 771 A.2d at 1148. It requires consideration of various factors, including,
(1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim, and (5) a reasonable explanation why there was not a strict compliance with the statute.
[Id. at 353, 771 A.2d at 1149.]
Technical defects in complying with statutes that require notice of legal claims will not be allowed to prevent recovery by meritorious claimants if the elements of the doctrine are met. Zamel v. Port of N.Y. Auth., 56 N.J. 1, 6-7, 264 A.2d 201, 203-04 (1970).
The statute of frauds does not implicate the due process considerations inherent in lost opportunities to assert legal claims or notices of another's legal claims to one's property. The statute of frauds is fundamentally different. It sets forth the conditions under which a particular business transaction will be recognized as legally enforceable. The notice requirement serves to memorialize a prior agreement, rather than inform the recipient of a legal claim. Most importantly, it sets the conditions under which the recipient is obligated to act. The clear and unambiguous notice requirements allow each party to conduct *642 the transaction knowing its obligations and rights under the statute. Application of the doctrine of substantial compliance to the statute of frauds merely adds unnecessary uncertainty to these types of transactions and increases the likelihood of litigation.
As the circumstances of this case and C & J Colonial Realty make clear, brokerage commissions for commercial properties can amount to hundreds of thousands of dollars. Normally, such financially significant business transactions are subject to negotiation with a written document that fully expresses the parties' agreement as to their respective rights and obligations. To the extent a broker wishes to rely on the protections of the statute of frauds to claim entitlement to a commission, he or she must strictly comply with the statute's requirements.
It is unnecessary for this court to resolve defendant's contention that plaintiffs' notice was deficient because it failed to include a material term, namely when payment of the commission would occur. The statute requires that the "five-day letter" forwarded under N.J.S.A. 25:1-16(d)(1) must "state[ ] that its terms are those of the prior oral agreements including the rate or amount of commission to be paid." The fact that the statute recognizes that the amount of a commission is an essential term of a real estate brokerage agreement does not allow a broker to omit from the notice other terms of the agreement that it will later seek to enforce.
Glickman's letter evidenced his awareness of this requirement because he included in the notice the brokers' expectation of commissions on all future lease transactions between the buyer and seller. Nothing in the notice referred to the time of payment. In the case of a brokerage agreement pertaining to a lease, especially a long term one, the time of payment is a critical issue. While that omission would not have voided an otherwise compliant notice, a broker cannot expect to rely on the notice to enforce terms that are not specified therein. Here, the brokers had no basis for their contention to the trial court that they were entitled to claim the entire amount of their commission upon signing of the lease.
Moreover, unlike a sale of property where the funds are generally available to pay a commission at the time of closing from the proceeds of the sale, a lease transaction routinely requires only a small portion of the payments at the time the lease is signed even though the aggregate amount of the rent owed on a lease may be in the millions. In a commercial setting such as this, the lessor, therefore, might not expect to pay the entire commission up front, but rather would intend to spread out the commission over an agreed upon period of time.
It may appear to be a harsh result to compel plaintiffs to forego their entire commission because they failed to send the notice in compliance with the statute. However, notwithstanding plaintiffs' noncompliance with the statute and their omission of the terms of payment, they resisted defendant's efforts to negotiate the terms of the commission agreement. Nothing in the record bespeaks bad faith in defendant's ultimate refusal to comply with plaintiffs' demands for a full five percent commission to be paid at the time of the lease's signing. Defendant never claimed that plaintiffs were not entitled to a commission. Instead, defendant repeatedly stated that it would not sign a commission agreement until it knew the terms of the leasing deal. That is precisely what happened. Once the leasing deal was finalized, defendant attempted to negotiate the terms of the commission agreement. Glickman refused to negotiate *643 at all. Defendant's eventual offer of $400,000 can hardly be construed as evidence of bad faith or an intention to cheat plaintiffs out of a commission.
Despite the failure of the parties to settle the brokerage dispute between them, the result of not allowing plaintiffs to recover any commission at all is unpalatable. We are persuaded that plaintiffs are entitled to pursue recovery on a quantum meruit basis.
We are mindful that in McCann v. Biss, 65 N.J. 301, 310, 322 A.2d 161, 165-66 (1974), the Supreme Court held that a broker who fails to comply with the statute of frauds may not circumvent the statute by seeking recovery against the seller on a tortious interference or quantum meruit theory. See also Leimbach v. Regner, 70 N.J.L. 608, 609, 57 A. 138 (Sup.Ct.1904) (holding that a broker may not circumvent the statute of frauds by seeking recovery on a quantum meruit basis where purported agreement by owner to pay a commission was oral). In so holding, the Court quoted the governing statute of frauds, N.J.S.A. 25:1-9 (now repealed), which provided:
"No broker ... selling ... real estate for or on account of the owner shall be entitled to any commission for such sale..." unless his authority is in writing or recognized in a writing, signed by the owner or his authorized agent, before or after the sale, which states therein the rate or amount of commission or unless the broker serves a notice in writing on the owner within five days of the making of an oral agreement setting forth the terms thereof.
[McCann, supra, 65 N.J. at 309, 322 A.2d at 165 (quoting N.J.S.A. 25:1-9 (Emphasis supplied)).]
In rejecting causes of action for tortious interference and quantum meruit, the McCann Court observed that the method of oral "open listing," employed by the broker in that case, is:
open to much misunderstanding, as well as outright fraud, and is productive of a vast amount of litigation which would be avoided if brokers would take only listings confirmed by the signature of the seller in all aspects, including price and commission obligation (as specified in Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 236 A.2d 843 (1967)).
[McCann, supra, 65 N.J. at 308, 322 A.2d at 165.]
The Court also quoted the Restatement (Second) of Agency § 468 comment b (1958), which states that the purpose of requiring a signed memorandum in writing "is to protect against fraudulent claims for services." McCann, supra, 65 N.J. at 309, 322 A.2d at 165.
McCann is distinguishable from the present case because there the broker made no effort at all to comply with the governing statute. She did not have written authority from the sellers to sell the subject property to the buyer, nor did she serve upon them the written "five-day notice" after the alleged oral agreement with the sellers, as required by the statute. McCann, supra, 65 N.J. at 303, 322 A.2d at 161. Also, the broker's salesperson admitted that, at most, the owners agreed to an oral "open listing" amounting to "no more than an oral permission ... to the broker to seek and produce an acceptable buyer." Id. at 306, 322 A.2d at 163. In fact, the broker acknowledged that it was not an enforceable contract and that a "five-day notice served on the sellers was necessary to make it so." Ibid.
Here, the facts are strikingly different. Defendant acknowledged, pursuant to a request for admissions, Rule 4:22-1, that it received the faxed letter on or about June 26, 2001, the date it was sent. At his *644 deposition, John Westerhold, the leasing agent, admitted that he read the June 26, 2001 letter upon receipt, and acknowledged that the phone number on the faxed document was the phone number of defendant's fax machine. Upon receipt of the fax, defendant did not question the form of the notice given by plaintiffs. Indeed, defendant did not even raise the issue in its motion for summary judgment. Most compelling is defendant's representation in the form of the lease prepared by it and its prospective tenant that:
The Landlord and Tenant mutually represent to each other that Coldwell Banker Commercial/Feist & Feist Realty Corp[.] and Resource Realty of New Jersey, negotiated and consummated the within transaction and that neither party dealt with any other broker in connection with the within Lease, it being understood and agreed that the Landlord shall be responsible, at its sole cost and expense, to pay the real estate brokerage in connection with this Lease transaction.

[Emphasis added.]
In view of defendant's actual notice of the June 26, 2001 letter, and the reasonable expectations of the parties which was documented by the very negotiations engaged in by the parties to arrive at a brokerage fee on terms acceptable to both sides, we view the snuffing out of any recovery by plaintiffs for their services rendered because of the form of notice to be too draconian.
Our Supreme Court allowed a broker's recovery on a theory of quantum meruit against the buyer of real estate in Weichert Co. Realtors v. Ryan, 128 N.J. 427, 441, 608 A.2d 280, 287 (1992). There, the owner of property advised the broker that he wished to sell his property for $3 million with the sales commission to be paid by the buyer. Id. at 430, 608 A.2d at 281. The broker contacted Ryan, a local developer, who expressed interest in the property. Id. at 430-31, 608 A.2d at 281-82. After the broker obtained and gave Ryan lease and income information about the property, he presented Ryan with a letter stating that "a ten percent finders fee," is to be paid by him upon closing of title. Id. at 431, 608 A.2d at 282. Ryan refused to sign or acknowledge the letter. Ibid. However, in the contract of sale with seller, Ryan agreed that he had dealt with the broker and that he "agrees to pay any broker's commission due...." Id. at 432, 608 A.2d at 283. Ryan closed title on the property but did not pay the broker's fee for its services. Id. at 433, 608 A.2d at 283.
The broker's compliance with the then-governing statute of frauds was not an issue in Weichert since the broker was seeking a commission from the buyer, rather than from the seller. See id. at 440, 608 A.2d at 287 (citing N.J.S.A. 25:1-9). Rather, the threshold question was whether the broker and Ryan entered into an enforceable agreement. Id. at 435, 608 A.2d at 284. Concluding that the parties had not "mutually manifested assent to the essential terms of the contract[,]" id. at 439, 608 A.2d at 286, the Court nevertheless held that the broker was entitled to recover in quantum meruit for the reasonable value of his services. Id. at 441, 608 A.2d at 287. Although Weichert did not involve a claim against the seller and the consequence of failure to comply with the statute of frauds, it is instructive because it recognizes a broker's right to recovery in equity for the reasonable value of services in a case where an unenforceable agreement exists.
The quantum meruit theory was invoked in similar but different circumstances in Starkey, Kelly, Blaney & White v. Nicolaysen, 172 N.J. 60, 796 A.2d 238 (2002).
*645 There, the Court held that Starkey, an attorney, failed to communicate to his client in writing a contingency-fee agreement "`before or within a reasonable time after commencing the representation.'" Id. at 67, 796 A.2d at 242 (quoting RPC 1.5(b)). The Court concluded that the contingency-fee agreement was invalid because Starkey did not reduce it to writing for thirty-three months. Ibid. In reaching its conclusion, the Court observed that the reason for the writing requirement, which Starkey failed to meet, "is to avoid misunderstandings and to avoid fraud." Id. at 69, 796 A.2d at 243. "`The very purpose of RPC 1.5(b) is to have the client ... know without question his or her financial responsibility, as well as to prevent ... overcharging.'" Ibid. (quoting DeGraaff v. Fusco, 282 N.J.Super. 315, 320, 660 A.2d 9, 11-12 (App.Div.1995)).
However, the Court held that Starkey was entitled to recover the reasonable value of his services under the quantum meruit theory. It stated:

Quantum meruit is a form of quasi-contractual recovery and "`rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'" Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437, 608 A.2d 280[, 285] (1992) (quoting Callano v. Oakwood Park Homes Corp., 91 N.J.Super. 105, 108, 219 A.2d 332[, 334] (App.Div.1966)). "Courts generally allow recovery in quasi-contract when one party has conferred a benefit on another, and the circumstances are such that to deny recovery would be unjust." Ibid.

To recover under a theory of quantum meruit, a plaintiff must establish: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they ware rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir.1994) (internal quotations and citations omitted); accord Weichert Co. Realtors, Ltd., supra, 128 N.J. at 437-38, 608 A.2d 280[, 285-86].
[Id. at 68, 796 A.2d at 242-43.]
The Court concluded that Starkey met this four-part test: (1) he provided valuable legal services in good faith; (2) his clients accepted his services; (3) there was an expectation of payment by both parties; and (4) the reasonable value of his services had been established at trial. Ibid.
Here, as in Starkey, the technical violation of the governing condition to enforce an agreement, in this case the statute of frauds, precludes plaintiffs' recovery under the agreement. However, a factfinder may conclude that because plaintiffs conferred a benefit on defendant, the circumstances are such that to deny plaintiffs recovery would be unjust. Indeed, the equities may be stronger in favor of plaintiffs than in Starkey, since here plaintiffs' written notice was served in a timely manner and the parties engaged in substantial negotiations to resolve the amount of the brokerage fee and the terms of payment.
The evidence is substantial that plaintiffs provided valuable services to defendant in procuring a tenant. Unquestionably, defendant accepted plaintiffs' services and there was an expectation by all parties that plaintiffs would receive some remuneration for the services they rendered. There is also little question that defendant was enriched by plaintiffs' efforts in procuring a ready and willing tenant.
Reversed and remanded for further proceedings consistent with this opinion. Jurisdiction is not retained.